## CAMPBELL v. CHASE NAT. BANK OF CITY OF NEW YORK.

### UNITED STATES v. CAMPBELL.

### CAMPBELL v. MEDALIE, U. S. Atty.

District Court, S. D. New York.
Nov. 16, 1933.

Frederick Barber Campbell, of New York City, pro se, in support of motion above mentioned and of demurrers.

Rushmore, Bisbee & Stern, of New York City (James F. Sandefur, of New York City, of counsel), for Chase Nat. Bank submitting to any order which the court might make in Equity No. 76—307.

George Z. Medalie, U. S. Atty., of New York City (Thomas E. Dewey, Samuel C. Coleman, and Ira Koenig, Asst. U. S. Attys., all of New York City, on the brief), amici curiæ in Equity No. 76—307, and in opposition to motions above mentioned in Campbell v. Medalie, Equity No. 76—337, and in opposition to demurrers in United States v. Campbell, Criminal No. 95—764 and No. 95—807.

WOOLSEY, District Judge.

In Campbell v. Chase National Bank of the City of New York, Equity No. 76—307, a decree will be made dismissing the complaint therein without costs, on the ground that this court has not jurisdiction of the cause, and, consequently, of course, the plaintiff's motions therein are in all respects denied.

In Campbell v. Medalie, Equity No. 76—337, the defendant's motion to dismiss is granted, and a decree will be made dismissing the complaint therein, with costs, on the ground that there is an adequate remedy at law in the criminal proceeding, and that the cause, therefore, is wanting in equity; in consequence whereof the plaintiff's motion for an injunction pendente lite must fail and is hereby denied.

In United States v. Campbell, Criminal No. 95—764, and the superseding indictment, Criminal 95—801, I grant an order overruling the demurrer to the original indictment and the demurrer to the first count of the superseding indictment with the provision as to suspension of the operation of my orders hereinafter indicated.

I sustain the demurrer to the second count of the superseding indictment and grant an order dismissing that count.

I. The facts involved in these cases are simple.

1. On or about October 11, 1932, the complainant, Frederick Barber Campbell, a citizen of New York State and a resident of this city, having purchased thirteen bars of gold bullion, duly marked and numbered, deposited them for safe-keeping with the Chase National Bank of the City of New York as bailee.

On or about January 25, 1933, having purchased fourteen more bars of gold bullion, duly marked and numbered, Campbell deposited them also for safe-keeping with the Chase National Bank of the City of New York as bailee.

In respect of both these deposits, the Chase National Bank agreed in writing, in consideration of a reasonable fee, to take and maintain custody, as bailee, of the said bars of gold bullion and to return them to Campbell on demand.

The fee for these bailments was paid before Campbell made the demand hereinafter mentioned for the delivery of the twenty-seven bars of gold bullion to him.

2. On March 9, 1933, the President approved an "Act to provide relief in the existing national emergency in banking, and for other purposes" which Congress had passed (48 Stat. 1).

This act, so far as here relevant, reads as follows:

"That the Congress hereby declares that a serious emergency exists and that it is imperatively necessary speedily to put into effect remedies of uniform national application.

"Title I

"Section 1. The actions, regulations, rules, licenses, orders and proclamations heretofore or hereafter taken, promulgated, made, or issued by the President of the United States or the Secretary of the Treasury since March 4, 1933, pursuant to the authority conferred by subdivision (b) of section 5 of the Act of October 6, 1917, as amended, are hereby approved and confirmed.

"Sec. 2. Subdivision (b) of section 5 of the Act of October 6, 1917 (40 Stat. L. 411), as amended, is hereby amended to read as follows:

" '(b) During time of war or during any other period of national emergency declared by the President, the President may, through any agency that he may designate, or otherwise, investigate, regulate, or prohibit, under such rules and regulations as he may prescribe, by means of licenses or otherwise, any transactions in foreign exchange, transfers of credit between or payments by banking institutions as defined by the President, and export, hoarding, melting, or earmarking of gold or silver coin or bullion or currency, by any person within the United States or any place subject to the jurisdiction thereof; and the President may require any person engaged in any transaction referred to in this subdivision to furnish under oath, complete information relative thereto, including the production of any books of account, contracts, letters or other papers, in connection therewith in the custody or control of such person, either before or after such transaction is completed. Whoever willfully violates any of the provisions of this subdivision or of any license, order, rule or regulation issued thereunder, shall, upon conviction, be fined not more than $10,000, or, if a natural person, may be imprisoned for not more than ten years, or both; and any officer, director, or agent of any corporation who knowingly participates in such violation may be punished by a like fine, imprisonment, or both. As used in this subdivision the term "person" means an individual, partnership, association, or corporation.'

"Sec. 3. Section 11 of the Federal Reserve Act is amended by adding at the end thereof the following new subsection:

" '(n) Whenever in the judgment of the Secretary of the Treasury such action is necessary to protect the currency system of the United States, the Secretary of the Treasury, in his discretion, may require any or all individuals, partnerships, associations and corporations to pay and deliver to the Treasurer of the United States any or all gold coin, gold bullion, and gold certificates owned by such individuals, partnerships, associations and corporations. Upon receipt of such gold coin, gold bullion or gold certificates, the Secretary of the Treasury shall pay therefor an equivalent amount of any other form of coin or currency coined or issued under the laws of the United States. The Secretary of the Treasury shall pay all costs of the transportation of such gold bullion, gold certificates, coin, or currency, including the cost of insurance, protection, and such other incidental costs as may be reasonably necessary. Any individual, partnership, association, or corporation failing to comply with any requirement of the Secretary of the Treasury made under this subsection shall be subject to a penalty equal to twice the value of the gold or gold certificates in respect of which such failure occurred, and such penalty may be collected by the Secretary of the Treasury by suit or otherwise.' " 12 USCA § 248 (n); 50 USCA Appendix §§ 5, 5a.

3. The President has issued four executive orders, purporting to have been made under authority of section 2 of the Act of March 9, 1933, just quoted. Of these only two are here in any way relevant, namely, the Executive Orders of April 5, 1933, and of August 28, 1933.

On April 5, 1933, the President issued his first executive order under the said Act of March 9, 1933. This order was a requisition order on gold, and read as follows:

"Executive Order

"Forbidding the Hoarding of Gold Coin, Gold Bullion and Gold Certificates.

"By virtue of the authority vested in me by Section 5 (b) of the Act of October 6, 1917, as amended by Section 2 of the Act of March 9, 1933, entitled 'An Act to provide relief in the existing national emergency in banking, and for other purposes', in which amendatory Act Congress declared that a serious emergency exists, I, Franklin D. Roosevelt, President of the United States of America, do declare that said national emergency still continues to exist and pursuant to said section do hereby prohibit the hoarding of gold coin, gold bullion, and gold certificates within the continental United States by individuals, partnerships, associations and corporations and hereby prescribe the following regulations for carrying out the purposes of this order:

"Section 1. For the purposes of this regulation, the term 'hoarding' means the withdrawal and withholding of gold coin, gold bullion or gold certificates from the recognized and customary channels of trade. The term 'person' means any individual, partnership, association or corporation.

"Section 2. All persons are hereby required to deliver on or before May 1, 1933, to a Federal reserve bank or a branch or agency thereof or to any member bank of the Federal Reserve System all gold coin, gold bullion and gold certificates now owned by them or coming into their ownership on or before April 28, 1933, except the following:

"(a) Such amount of gold as may be required for legitimate and customary use in industry, profession or art within a reasonable time, including gold prior to refining and stocks of gold in reasonable amounts for the usual trade requirements of owners mining and refining such gold.

"(b) Gold coin and gold certificates in an amount not exceeding in the aggregate $100.00 belonging to any one person; and gold coins having a recognized special value to collectors of rare and unusual coins.

"(c) Gold coin and bullion earmarked or held in trust for a recognized foreign government or foreign central bank or the Bank for International Settlements.

"(d) Gold coin and bullion licensed for other proper transactions (not involving hoarding) including gold coin and bullion imported for reexport or held pending action on applications for export licenses.

"Section 3. Until otherwise ordered any person becoming the owner of any gold coin, gold bullion, or gold certificates after April 28, 1933, shall, within three days after receipt thereof, deliver the same in the manner prescribed in Section 2; unless such gold coin, gold bullion or gold certificates are held for any of the purposes specified in paragraphs (a), (b) or (c) of Section 2; or unless such gold coin or gold bullion is held for purposes specified in paragraph (d) of Section 2 and the person holding it is, with respect to such gold coin or bullion, a licensee or applicant for license pending action thereon.

"Section 4. Upon receipt of gold coin, gold bullion or gold certificates delivered to it in accordance with Sections 2 or 3, the Federal reserve bank or member bank will pay therefor an equivalent amount of any other form of coin or currency coined or issued under the laws of the United States.

"Section 5. Member banks shall deliver all gold coin, gold bullion and gold certificates owned or received by them (other than as exempted under the provisions of Section 2) to the Federal reserve banks of their respective districts and receive credit or payment therefor.

"Section 6. The Secretary of the Treasury, out of the sum made available to the President by Section 501 of the Act of March 9, 1933, will in all proper cases pay the reasonable costs of transportation of gold coin, gold bullion or gold certificates delivered to a member bank or Federal reserve bank in accordance with Sections 2, 3, or 5 hereof, including the cost of insurance, protection, and such other incidental costs as may be necessary, upon production of satisfactory evidence of such costs. Voucher forms for this purpose may be procured from Federal reserve banks.

"Section 7. In cases where the delivery of gold coin, gold bullion or gold certificates by the owners thereof within the time set forth above will involve extraordinary hardship or difficulty, the Secretary of the Treasury may, in his discretion, extend the time within which such delivery must be made. Applications for such extensions must be made in writing under oath, addressed to the Secretary of the Treasury and filed with a Federal reserve bank. Each application must state the date to which the extension is desired, the amount and location of the gold coin, gold bullion and gold certificates in respect of which such application is made and the facts showing extension to be necessary to avoid extraordinary hardship or difficulty.

"Section 8. The Secretary of the Treasury is hereby authorized and empowered to issue such further regulations as he may deem necessary to carry out the purposes of this order and to issue licenses thereunder, through such officers or agencies as he may designate, including licenses permitting the Federal reserve banks and member banks of the Federal Reserve System, in return for an equivalent amount of other coin, currency or credit, to deliver, earmark or hold in trust gold coin and bullion to or for persons showing the need for the same for any of the purposes specified in paragraphs (a), (c) and (d) of Section 2 of these regulations.

"Section 9. Whoever willfully violates any provision of this Executive Order or of these regulations or of any rule, regulation or license issued thereunder may be fined not more than $10,000, or, if a natural person, may be imprisoned for not more than ten years, or both; and any officer, director, or agent of any corporation who knowingly participates in any such violation may be punished by a like fine, imprisonment, or both.

"This order and these regulations may be modified or revoked at any time." (12 USCA § 248 note).

On August 28, 1933, a third executive order was issued by the President under said Act of March 9, 1933. So far as here relevant that order reads as follows:

"Executive Order

"By virtue of the authority vested in me by section 5 (b) of the act of October 6, 1917, as amended by section 2 of the act of March 9, 1933, entitled 'An act to provide relief in the existing national emergency in banking and for other purposes', I, Franklin D. Roosevelt, President of the United States of America, do declare that a period of national emergency exists, and by virtue of said authority and of all other authority vested in me, do hereby prescribe the following provisions for the investigation and regulation of the hoarding, earmarking, and export of gold coin, gold bullion, and gold certificates by any person within the United States or any place subject to the jurisdiction thereof; and for the investigation and regulation of transactions in foreign exchange and transfers of credit and the export or withdrawal of currency from the United States or any place subject to the jurisdiction thereof by any person within the United States or any place subject to the jurisdiction thereof.

"Sec. 2. *Definitions.*—As used in this order the term 'person' means an individual, partnership, association, or corporation; and the term 'the United States' means the United States and any place subject to the jurisdiction thereof.

"Sec. 3. *Returns.*—Within 15 days from the date of this order every person in possession of and every person owning gold coin, gold bullion, or gold certificates shall make under oath and file as hereinafter provided a return to the Secretary of the Treasury containing true and complete information relative thereto, including the name and address of the person making the return; the kind and amount of such coin, bullion, or certificates held and the location thereof; if held for another, the capacity in which held and the person for whom held, together with the post-office address of such person; and the nature of the transaction requiring the holding of such coin, bullion, or certificates and a statement explaining why such transaction cannot be carried out by the use of currency other than gold certificates; provided that no returns are required to be filed with respect to—

"(a) Gold coin, gold bullion, and gold certificates in an amount not exceeding in the aggregate $100 belonging to any one person;

"(b) Gold coin having a recognized special value to collectors of rare and unusual coin;

"(c) Gold coin, gold bullion, and gold certificates acquired or held under a license heretofore granted by or under authority of the Secretary of the Treasury; and

"(d) Gold coin, gold bullion, and gold certificates owned by Federal Reserve banks. Such return required to be made by an individual shall be filed with the collector of internal revenue for the collection district in which such individual resides. * * * Such return required to be made by a partnership, association, or corporation shall be filed with the collector of internal revenue of the collection district in which is located the principal place of business or principal office or agency of such partnership, association, or corporation. * * *

"The Secretary of the Treasury may grant a reasonable extension of time for filing a return, under such rules and regulations as he shall prescribe. No such extension shall be for more than 45 days from the date of this Executive order. An extension granted hereunder shall be deemed a license to hold for a period ending 15 days after the expiration of the extension.

"The returns required to be made and filed

under this section shall constitute public records; but they shall be open to public inspection only upon order of the President and under rules and regulations prescribed by the Secretary of the Treasury.

"A return made and filed in accordance with this section by the owner of the gold coin, gold bullion, and gold certificates described therein, or his duly authorized agent, shall be deemed an application for the issuance under section 5 hereof of a license to hold such coin, bullion, and certificates. * * *

"Sec. 5. *Holding of Gold Coin, Gold Bullion, and Gold Certificates.*—After 30 days from the date of this order no person shall hold in his possession or retain any interest, legal or equitable, in any gold coin, gold bullion, or gold certificates situated in the United States and owned by any person subject to the jurisdiction of the United States, except under license therefor issued pursuant to this Executive order; provided, however, that licenses shall not be required in order to hold in possession or retain an interest in gold coin, gold bullion, or gold certificates with respect to which a return need not be filed under section 3 hereof.

"The Secretary of the Treasury, subject to such further regulations as he may prescribe, shall issue licenses authorizing the holding of—

"(a) Gold coin, gold bullion, and gold certificates, which the Secretary is satisfied are required by the person owning the same for necessary and lawful transactions for which currency, other than gold certificates, cannot be used;

"(b) Gold bullion which the Secretary, or such agency as he may designate, is satisfied is required for legitimate and customary use in industry, profession, or art by a person regularly engaged in such industry, profession, or art or in the business of furnishing gold therefor;

"(c) Gold coin and gold bullion earmarked or held in trust since before April 20, 1933, for a recognized foreign government or foreign central bank or the Bank for International Settlements; and

"(d) Gold coin and gold bullion imported for reexport or held pending action upon application for export licenses. * * *

"Sec. 9. The Secretary of the Treasury is hereby authorized and empowered to issue such regulations as he may deem necessary to carry out the purposes of this order. Such regulations may provide for the detention in the United States of any gold coin, gold bullion, or gold certificates sought to be transported beyond the limits of the continental United States, pending an investigation to determine if such coin, bullion, or certificates are held or are to be acquired in violation of the provisions of this Executive order. Licenses and permits granted in accordance with the provisions of this order and the regulations prescribed hereunder, may be issued through such officers or agencies as the Secretary may designate.

"Sec. 10. Whoever willfully violates any provision of this Executive order or of any license, order, rule, or regulation issued or prescribed hereunder, shall, upon conviction, be fined not more than $10,000, or, if a natural person, may be imprisoned for not more than 10 years, or both; and any officer, director, or agent of any corporation who knowingly participates in such violation may be punished by a like fine, imprisonment, or both.

"Sec. 11. The Executive orders of April 5, 1933, forbidding the hoarding of gold coin, gold bullion, and gold certificates, and April 20, 1933, relating to foreign exchange and the earmarking and export of gold coin or bullion or currency, respectively, are hereby revoked. The revocation of such prior Executive orders shall not affect any act done, or any right accruing or accrued, or any suit or proceeding had or commenced in any civil or criminal cause prior to said revocation, but all liabilities under said executive orders shall continue and may be enforced in the same manner as if said revocation had not been made. This Executive order and any regulations or licenses issued hereunder may be modified or revoked at any time."

On September 12, 1933, the Secretary of the Treasury issued, under and pursuant to the authority of section 9 of the Executive Order of August 28, 1933, a pamphlet of gold regulations. By these regulations the time for the filing of returns mentioned in section 3 of the said Executive Order was extended to September 18, 1933, and it was provided inter alia so far as such returns were concerned as follows:

"Article 6. *Persons required to file returns* (Section 3).—Except as provided in Section 3(a), (b), (c), and (d), returns must be filed with respect to all gold coin, gold bullion, and gold certificates situated within the continental United States by all persons in actual or constructive possession thereof, and, in addition, by all persons owning such coin, bullion, and certificates unless such persons are not subject to laws effective within the

limits of the United States. Gold acquired as scrap gold or sweepings is not to be considered as gold acquired under license within the meaning of Section 3 (e) and must be included in the return. The returns made and filed by the owners of the coin, bullion, or certificates described in the returns, or by their duly authorized agents, shall be deemed to be applications for the issuance of a license under Section 5 to hold such coin, bullion, and certificates.

"Article 7. *Form of returns* (Section 3). —Returns shall be made upon Form TG–1. Such returns shall contain true and complete information in relation to all gold coin, gold bullion, and gold certificates owned by, and/or in the possession of the person making the return, or on whose behalf the return is made and filed, and shall include all the information required in the form of return.

"Article 8. *Filing of returns* (Section 3).—Returns shall be executed and filed in triplicate with the Collector of Internal Revenue as provided in Section 3. A return shall be deemed to have been filed when it is received by the proper Collector of Internal Revenue or when it is properly addressed and mailed and bears a postmark dated prior to midnight of September 18, 1933. At the close of each business day the Collectors of Internal Revenue shall forward one executed copy of every return filed on that day to the Secretary of the Treasury and another executed copy to the Federal Reserve Bank of the Federal Reserve district which embraces the city in which the Collector of Internal Revenue has his office. As promptly as possible each Federal Reserve bank shall forward to the Secretary of the Treasury its recommendations as to whether the application for a license to hold the gold coin, gold bullion, or gold certificates described in the return should be granted or denied, in whole or in part."

The following regulations inter alia were made by the Secretary of the Treasury under sections 3 and 5 of the Executive Order of August 28, 1933:

"Article 16. *Returns considered as applications to hold* (Sections 3 and 5).—A return made on Form TG–1 and filed in accordance with Section 3 by the owner of gold coin, gold bullion, or gold certificates described therein, or his duly authorized agent, shall be deemed an application for the issuance under Section 5 of a license to hold such coin, bullion, and certificates. Further application is not required to be made or filed with respect to such gold. The Secretary of the Treasury may, however, withhold action upon any such return pending receipt from the applicant, or the determination by further investigation, of such additional information as the Secretary of the Treasury deems necessary to establish that the gold coin, gold bullion, or gold certificates described in the return are required by the person owning the same for the purpose specified in Section 5 (a) or (b), or that the application comes within the provisions of Section 5 (c) or (d).

"Article 17. *Licenses to hold* (Sections 3 and 5).—A license on Form TG–1 to hold gold coin, gold bullion, or gold certificates will entitle the holder to hold such coin, bullion, or certificates stated in the license during the period of time, and for the purpose or purposes, specified in the license. The license will be mailed to the person who executed the return at the address given in the return. If a license is denied, the Secretary of the Treasury will advise the person who executed the return by telegraph or by letter mailed to the address given in the return. Failure to receive advice that a license has been denied shall not be construed as evidence that the license has been granted."

4. Under date of September 13, 1933, the assistant cashier of the Chase National Bank wrote to Mr. Campbell the following letter:

"September 13, 1933.

"Mr. Frederick B. Campbell, % Campbell & Whipp, 20 Exchange Place, New York City

"Dear Mr. Campbell: Referring further to the deposit of gold bars in safekeeping for your account, we are enclosing a form of return issued by the Treasury Department. As you will see, we shall be obliged to file such a return with the Collector of Internal Revenue not later than September 18, 1933, in connection with the gold held in safekeeping for your account. By referring to the instructions on page 3, you will note that owners of gold are also required, under the Executive Order of August 28th, to file a return with the Collector of Internal Revenue.

"Permit us again to call your attention to Section No. 5 of the President's Order, reciting that after thirty days from the date of the Order we shall be required to surrender any gold in our possession not covered by a license, as set forth in that Section.

"Yours very truly,
"Henry Rauh, Assistant Cashier."

Under date of September 16, 1933, two days before the last day for returns to be filed in accordance with the Executive Order of August 28, 1933, Mr. Campbell made demand

on the Chase National Bank for delivery of his gold in a letter which reads as follows:

"September 16, 1933

"The Chase National Bank of the City of New York, Nassau and Pine Streets, New York City

"Attention Mr. Frank O. Roe, Vice-President
Mr. Emmett F. Smith, 2nd Vice-President
Mr. Henry Rauh, Assistant Cashier

"Dear Sirs: I hereby demand the delivery to me forthwith of the gold bars covered by your safe-keeping receipts as follows:

"Receipt No. D 15319, dated 10/11/32, for 13 gold bars melt No. 1530 (erroneously stated in receipt as No. 13, correction verified by your Mr. Rauh), bar Nos. .018424–36;

"Receipt No. D 26600, dated 1/25/33, for 14 gold bars, melt No. 3682, bar Nos. .065888 to 901.

"Yours very truly,
"Frederick B. Campbell."

Under date of September 18, 1933, a vice president of the bank wrote Mr. Campbell the following letter:

"September 18, 1933

"Mr. Frederick B. Campbell, % Messrs. Campbell & Whipp, 20 Exchange Place, New York, N. Y.

"Dear Mr. Campbell: We acknowledge receipt of your letter of September 16, 1933, in which you demand delivery to you forthwith of 27 gold bars covered by our Safe-keeping Receipts Numbers D15319 and D26600.

"We regret that by reason of the provisions of the Executive Orders issued by the President of the United States under date of April 5, 1933, April 20, 1933 and August 28, 1933, we do not feel that we are in a position to deliver this gold to you at the present time.

"For your information we enclose herewith a copy of a Return which we are filing today with the Collector of Internal Revenue of the Second New York District on Form TG–1, prescribed by the Secretary of the Treasury.

"Yours very truly,
"Frank O. Roe, Vice President"

5. On September 26, 1933, Campbell filed a complaint in equity, Equity No. 76—307, against the Chase National Bank for the specific performance of its contracts of bailment, above mentioned, alleging the contracts and stating in paragraphs 8 and 9 of the complaint that the reason given by the defendant Chase National Bank for refusing to perform those contracts and return the bullion to him on demand was the existence of the executive orders above mentioned, and praying also for an injunction pendente lite against delivery of the gold to any one other than the complainant.

6. On September 28, 1933, the United States grand jury for the Southern district of New York indicted Campbell on a single count for failing to make, on or before September 18, 1933, the return in respect of his gold required by the regulations made by the President's Executive Order of August 28, 1933, issued pursuant to authority in him vested by section 2 of the Act of Congress of March 9, 1933, and the Regulations prescribed by the Secretary of the Treasury on September 12, 1933, in pursuance of the President's said executive order.

To this indictment the defendant Campbell demurred on the ground that the Act of Congress of March 9, 1933, above mentioned, was unconstitutional in so far as it purported to affect gold bullion in private ownership, and that the executive action taken thereunder was, therefore, without authority and invalid.

On October 5, 1933, the federal grand jury for the Southern district of New York filed a superseding indictment containing two counts. The first of the two counts was similar to the only count of the first indictment, namely, for Campbell's failure to make a return on or before September 18, 1933, in respect of the gold bullion which he owned.

The second count of the superseding indictment charged the defendant Campbell with having owned on the 28th day of September, 1933, and up to the time of the indictment, certain gold bullion within the Southern district of New York having a value of $200,000 or upwards, which was not acquired or held under a license and in respect of which he had willfully and knowingly continued, contrary to the Executive Order of August 28, 1933, to retain his legal and equitable interest and ownership of said gold without any license so to do.

To each count of the superseding indictment Campbell filed a demurrer based on the same grounds as his demurrer to the first indictment.

7. On the 3d day of October, 1933, Campbell, as complainant in the equity suit against the Chase National Bank, Equity No. 76—307, noticed a motion for an injunction pendente lite to restrain the bank from parting with his gold bullion of which it was bailee

until the determination of the action for specific performance of its contract of bailment.

When this motion was called before me as motion judge on the motion calendar on October 3, 1933, Campbell asked for more time, and I set the motion for oral argument on Monday, October 9, 1933.

During the week of October 3, 1933, the demurrers to the original and to the superseding indictment were referred to me by Judge Coxe then sitting in Criminal Part I of this court.

On October 9, 1933, I heard oral argument on this demurrer and the said motion for an injunction pendente lite and reserved decision.

8. Campbell also noticed a motion on the general motion calendar on October 17, 1933, for judgment in his favor on the pleadings in his suit against the Chase National Bank, Equity No. 76—307. This motion was also referred to me by Judge Patterson, who was then sitting as motion judge.

9. On or about October 17, 1933, Campbell brought suit in equity against George Z. Medalie, as United States attorney for the Southern district of New York, Equity No. 76—337, seeking to enjoin him from prosecuting against Campbell the superseding indictment above mentioned or any other indictment under the Act of March 9, 1933, and the regulations issued thereunder. On his own motion Campbell amended the complaint twice, and the bill now before me is referred to as the second amended bill.

On October 17, 1933, Campbell secured from Judge Patterson an order to show cause returnable on October 20, 1933, why an injunction pendente lite should not issue against said Medalie in Equity No. 76—337, and Medalie noticed for the same date a motion to dismiss the second amended bill of complaint therein on the ground that it did not set forth a cause of action in equity.

These cross-motions were also referred to me by Judge Patterson, and, therefore, I have before me all aspects of the litigation—both with the Chase National Bank and with the United States and its attorney—involving Campbell's contention that the Act of March 9, 1933, is unconstitutional, and that the executive orders of the President and the regulations of the Secretary of the Treasury made thereunder are, therefore, without authority and invalid.

10. I shall deal first with the two suits in equity for their inherent infirmities enable them to be disposed of on grounds not in-volving the constitutional question raised herein. Then I shall have a clear field to consider in the criminal case the question of constitutionality which is only therein raised on a justiciable basis.

II. In Campbell v. Chase National Bank of the City of New York, the plaintiff bases his complaint on a contract of bailment of bars of gold deposited with the Chase National Bank on two different occasions, and asks specific performance of that contract, and, until final decision, an injunction pendente lite against the bank's parting with the possession of the said bars of gold to any one other than the plaintiff.

1. Mr. Campbell's right of action against the Chase National Bank, which, as I have said, sounds in bailment, matured when, on his demand, the bank refused to return his gold bars to him in accordance with the contract of bailment between them. He could then certainly have maintained in the New York state courts an action for conversion, or, if he wished to retrieve the specific bars of gold which he had deposited with the bank, an action of replevin, or, possibly, a suit for specific performance based on the theory that at the present time, in view of governmental regulations, bars of gold are unique chattels, although such a suit would involve a somewhat doubtful equity owing to the legal remedy of replevin which would be available and which would constitute an adequate remedy at law. Jones v. MacKenzie, 122 F. 390, 393 (C. C. A. 8); Sultan of the Ottoman Empire v. Providence Tool Company (C. C.) 23 F. 572.

Instead of proceeding in the state court, however, Campbell brought his suit in this court, which is a court of limited jurisdiction.

2. In his complaint against the Chase National Bank of the City of New York, Campbell alleges that he is a citizen and resident of the borough of Manhattan, city, county, and state of New York, and that the bank is a banking corporation organized under the laws of the United States with its principal place of business at Nassau and Pine streets in the borough of Manhattan, city, county, and state of New York.

It is provided in title 28, United States Code, § 42 (28 USCA § 42) that "no district court shall have jurisdiction of any action or suit by or against any corporation upon the ground that it was incorporated by or under an Act of Congress."

After dealing with certain types of suits by or against national banking associations

among which such a cause as that before me is not included, it is provided in title 28, United States Code, § 41, subd. 16 (28 USCA § 41, (16) that " * * * all national banking associations established under the laws of the United States shall, for the purposes of all other actions by or against them, real, personal, or mixed, and all suits in equity, be deemed citizens of the States in which they are respectively located."

It follows from these provisions that the court has not jurisdiction in respect of the suit of Campbell v. The Chase National Bank of the City of New York either on the basis of diversity of citizenship, or of the fact that the bank is incorporated under a federal statute. Compare Federal Intermediate Credit Bank v. Mitchell, 277 U. S. 213, 215–216, 48 S. Ct. 449, 72 L. Ed. 854; Herrmann v. Edwards, 238 U. S. 107, 112, 118, 35 S. Ct. 839, 59 L. Ed. 1224; Whittemore v. Amoskeag National Bank, 134 U. S. 527, 529, 10 S. Ct. 592, 33 L. Ed. 1002.

■ 3. Campbell was, therefore, forced to invoke as a ground for the jurisdiction of this court in his suit that his suit was of a civil nature in equity, that the amount involved was upwards of the statutory requirement of $3,000 exclusive of interest and costs, and that it arose under the Constitution and laws of the United States. See title 28, United States Code, § 41, subd. 1.

The gravamen of Campbell's cause of action against the bank is its failure to perform its contract of bailment, made with him, by refusing to return the gold bullion which he deposited with it. This is properly set forth in paragraphs 1 to 7, inclusive, of his complaint, and the basis for the remedy of specific performance which he seeks is set forth in paragraph 11 thereof.

Paragraphs 8, 9, and 10 are merely statements of the bank's reasons for not performing its contract with him and Campbell's reasons for disagreeing with the bank's attitude. They are allegations which are mere surplusage, included with the obvious purpose of giving color to jurisdiction in this court under a claim that the plaintiff's cause of action arises under the Constitution and laws of the United States when it actually arises only under a contract of bailment made in New York state with the Chase National Bank, and is in fact an action of replevin in equitable dress involving one of the most ancient of legal relationships.

I hold, therefore, that this court has not any jurisdiction of the controversy. In

Louisville & Nashville R. R. Co. v. Mottley, 211 U. S. 149, 29 S. Ct. 42, 53 L. Ed. 126, referring to the same basis of jurisdiction as is claimed in the present case, Mr. Justice Moody said at page 152 of 211 U. S., 29 S. Ct. 42, 43: "There was no diversity of citizenship, and it is not and cannot be suggested that there was any ground of jurisdiction, except that the case was a 'suit * * * arising under the Constitution or laws of the United States.' [Act of August 13, 1888, c. 866] 25 Stat. 433, 434 [28 USCA § 71]. It is the settled interpretation of these words, as used in this statute, conferring jurisdiction, that a suit arises under the Constitution and laws of the United States only when the plaintiff's statement of his own cause of action shows that it is based upon those laws or that Constitution. It is not enough that the plaintiff alleges some anticipated defense to his cause of action, and asserts that the defense is invalidated by some provision of the Constitution of the United States. Although such allegations show that very likely, in the course of the litigation, a question under the Constitution would arise, they do not show that the suit, that is, the plaintiff's original cause of action, arises under the Constitution."

To the same effect is Taylor v. Anderson, 234 U. S. 74, 75, 76, 34 S. Ct. 724, 58 L. Ed. 1218, and cases therein cited.

For the reasons stated, the complaint in Campbell v. Chase National Bank is dismissed on the ground of lack of subject-matter jurisdiction.

■ III. In the suit of Campbell v. Medalie, as United States Attorney for the Southern District of New York, Equity No. 76—337, brought to enjoin the enforcement criminally of the penalties prescribed by the Act of March 9, 1933, and the regulations thereunder made, on the ground that said act was unconstitutional and the regulations consequently void, I dismiss the complaint on the ground that it wants equity.

In all the cases which I have found or which have been cited to me, wherein injunctions have been sustained against law-enforcing officers, it has been to protect an equity jurisdiction already secured—an entirely familiar attitude of equity courts—and as an incident of such protection to prevent *threatened* criminal action. Cf. Philadelphia Company v. Stimson, 223 U. S. 605, 621, 32 S. Ct. 340, 56 L. Ed. 570.

Before Campbell filed his suit against the United States attorney, both the original in-

dictment and the superseding indictment were found and the criminal part of this court had already taken jurisdiction of the criminal proceeding.

Under our federal jurisprudence, the equity part and the law part—civil and criminal—of the court, although administered by the same judges, are wholly separate. In re Sawyer, 124 U. S. 200, 209, 210, 8 S. Ct. 482, 31 L. Ed. 402, and cases there cited.

In the only case which I have found in which criminal proceedings had been begun before the equity proceeding, the complainant in equity was relegated to the criminal proceeding for any challenge he wished to make to the constitutionality of the statute involved. Fitts v. McGhee, 172 U. S. 516, 532, 19 S. Ct. 269, 43 L. Ed. 535.

To allow the maintenance of a suit in equity under such circumstances as we find here after an indictment has been had would be, I think, an intolerable interference by the courts with the enforcement of law by the executive; for Campbell has raised the constitutional question here involved in the criminal case by his demurrers, and that question can be decided as well there as on the equity side of the court.

Campbell has, therefore, an adequate remedy at law—that it may not be such an agreeable remedy from his point of view is beside the point.

IV. Having thus disposed of the two suits brought by Campbell and the relief sought by him therein, I can turn, untrammeled by further procedural problems, to the criminal case in which the United States has indicted Campbell and deal with the real question involved in the situation which has been laid before me.

The demurrer to the two counts of the superseding indictment raises the question of the constitutionality, from various aspects, of title 1 of the Act of March 9, 1933, and also of the validity of the executive orders which purport to have been made under section 2 thereof, both as to their constitutionality and as to their having been made within the authority conferred by the said act on the President.

The points raised in the demurrer will now be considered in the order of their importance, as I see it, which is:

1. Did Congress have power under the Constitution to pass title 1 of the Act of March 9, 1933?

2. If Congress did have that power, did it exercise it in the proper manner by declaring a policy and delegating to the President, in section 2, and to the Secretary of the Treasury, in section 3, respectively, the power of making regulations under the said sections?

3. If the manner in which Congress exercised its power was constitutional, were the executive orders made by the President and the regulations pursuant thereto of the Secretary of the Treasury, on which the prosecution of the defendant is founded, within the authority granted to the President by Congress in section 2 of title 1 of the Act of March 9, 1933?

4. If the executive orders were within the authority given by Congress to the President, was that authority exercised in such a manner as not to violate any of the defendant's constitutional rights?

V. When the claim is made before a federal court, as in this case that an act of Congress or executive orders made thereunder are unconstitutional, the court must entertain such contention with cautious skepticism, for in such case it is not dealing with raw facts, but with considered results reached by members of co-ordinate branches of the government, sworn, as courts are, to sustain and defend the Constitution. Cf. Legal Tender Cases, 12 Wall. 457, 531, 20 L. Ed. 287.

It must always be remembered, of course, that an emergency cannot be allowed to beget a power in Congress, but it must also be remembered that an emergency may call for the exercise by Congress of an existing power which may have always lain latent—an unused weapon in its constitutional arsenal.

The frontiers of necessary action by the federal government are constantly shifting, and, as a result, the methods of using federal governmental powers have to change from time to time, and hitherto unused powers have to be invoked to cope with the varied exigencies encountered. Hence the fact that Congress in passing an act has invoked one of its powers, apparently for the first time, should excite an emotion of interest not of inhospitality in the mind of the judge who is called on to test its constitutionality.

VI. By the Constitution, article 1, section 8 (clauses 2, 5, 18), the people of the United States lodged with Congress inter alia the power:

"To borrow Money on the credit of the United States;

"To coin Money, regulate the Value thereof, and of foreign Coin; * * *

"To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."

When Congress passed the Act of March 9, 1933, it declared in the preamble thereof "that a serious emergency exists and that it is imperatively necessary speedily to put into effect remedies of uniform national application."

■ This court can take judicial notice of the fact that the banks of the country were then closed, and that it was of vital importance that, as soon as possible, each bank which was in a proper condition to function should be reopened; that it was obvious that gold coin and gold bullion could not be allowed to be taken away from the banks, but that every dictate of wisdom pointed to the necessity of having all gold in the banks remain there, and that all gold, whether coin or bullion, already in the hands of private persons, should be brought back, whenever the authorities might deem necessary, into the hands of some fiscal agency of the government.

■ Gold has for ages been the symbol of wealth, and in modern times has been recognized throughout almost the whole world as the basis—sometimes alone and sometimes in connection with silver—of all currency and credit. Under the provisions of the Constitution above quoted, Congress, which is given plenary power to coin money and regulate the value thereof, and to borrow on the credit of the United States, must, as an incident of those powers, also have power to legislate regarding gold bullion held by persons within the United States and to treat gold bullion as affected with public interest.

The argument made by Campbell that gold bullion is a commodity and is distinguishable from gold coin which has received the government's stamp as money, with the result that gold bullion can only be regulated by the states as a commodity, and not by Congress as a potential source of money or credit, is fully met, I think, by a statement made in United States v. Ferger, 250 U. S. 199 at page 203, 39 S. Ct. 445, 446, 63 L. Ed. 936, by Chief Justice White, as to the plenary power given to Congress over interstate and foreign commerce. The Chief Justice there said: "Thus both in the pleadings and in the contention as summarized by the court below it is insisted that, as there was and could be no commerce in a fraudulent and fictitious bill of lading, therefore the power of Congress to regulate commerce could not embrace such pretended bill. But this mistakenly assumes that the power of Congress is to be necessarily tested by the intrinsic existence of commerce in the particular subject dealt with, instead of by the relation of that subject to commerce and its effect upon it."

Changing this paragraph so that it will apply to the contentions made and the questions involved in the instant case, Campbell's argument mistakenly assumes that the power of Congress over money is to be necessarily tested by whether gold bullion is money instead of by the relation of gold bullion to money and its effect thereon.

The powers of Congress under the clauses above quoted are on their face exceedingly broad because they involve, not only power to coin money, but to regulate the value thereof, and to borrow money on the credit of the United States, and, of course, by necessary implication, to maintain the credit of the United States so that money can be borrowed for the United States on advantageous terms. These powers must necessarily be broad enough to achieve the objective of a currency which should be of universal circulation throughout the United States. Consequently, it has been held that Congress has the power to declare what is to be legal tender, Legal Tender Cases, 12 Wall. 457, 545, 20 L. Ed. 287; to provide for the issuance of paper money as legal tender in the performance of contracts made both before and after the passage of such legal tender acts, Legal Tender Cases, 12 Wall. 457, 20 L. Ed. 287; for the reissuance of such paper money as legal tender after its redemption, Juilliard v. Greenman, 110 U. S. 421, 4 S. Ct. 122, 28 L. Ed. 204; and, indeed, under the two powers of coining money and regulating the value thereof to establish a national currency either in coin or in paper and to make that currency lawful money for all purposes (both in regard to the national and state governments and to private individuals), Juilliard v. Greenman, 110 U. S. 421, 448, 4 S. Ct. 122, 28 L. Ed. 204; and to vary the value of the amount of gold to be contained in the dollar, Legal Tender Cases, 12 Wall. 457, 20 L. Ed. 287; Juilliard v. Greenman, 110 U. S. 421, 449, 4 S. Ct. 122, 28 L. Ed. 204.

It has also been held that the same powers permit Congress to create a national bank or banks with all the powers incident to such institutions, McCulloch v. Maryland, 4 Wheat. 421, 4 L. Ed. 579, First National Bank of

Bay City v. Union Trust Company, 244 U. S. 416, 37 S. Ct. 734, 61 L. Ed. 1233, L. R. A. 1918C, 283, Ann. Cas, 1918D, 1169, and in order to protect the national currency from interference by issues of state bank notes to impose a prohibitive tax on such notes, Veazie Bank v. Fenno, 8 Wall. 533, 19 L. Ed. 482.

It seems to me perfectly clear from these decisions that gold need not be dealt with as an ordinary commodity, but that it is a commodity affected with a public interest as a potential source of currency and credit, and that Congress when it considers that the national exigency demands control of gold may control gold in such manner and to such extent as it deems to be advisable, provided always that it does not violate the personal constitutional privileges of citizens.

As was said in Juilliard v. Greenman, 110 U. S. 421 at page 450, 4 S. Ct. 122, 131, 28 L. Ed. 204: " * * * The question whether at any particular time, in war or in peace, the exigency is such, by reason of unusual and pressing demands on the resources of the government, or of the inadequacy of the supply of gold and silver coin to furnish the currency needed for the uses of the government and of the people, that it is, as matter of fact, wise and expedient to resort to this means [the enactment of 'legal tender' laws], is a political question, to be determined by congress when the question of exigency arises, and not a judicial question, to be afterwards passed upon by the courts."

There has not been cited to me any case which involves the precise question here presented, but the Supreme Court has held that the private ownership of silver coin is subject to the will of the sovereign and can be controlled by the sovereign.

In Ling Su Fan v. United States, 218 U. S. 302, 31 S. Ct. 21, 54 L. Ed. 1049, 30 L. R. A. (N. S.) 1176, the Supreme Court had before it, on appeal from the Supreme Court of the Philippines, an act of the Philippine government prohibiting the export of Philippine silver coin from the Philippine Islands. This act was attacked as invalid in that it constituted a deprivation or limitation on the owner of such silver coin "without due process of law" which was a limitation put on the acts of the Philippine government by the basic law under which it was constituted.

Mr. Justice Lurton, writing the opinion of the court, said, 218 U. S. at page 310, 31 S. Ct. 21, 23, 54 L. Ed. 1049, 30 L. R. A. (N. S.) 1176: "Conceding the title of the owner of such coins, yet there is attached to such ownership those limitations which public policy may require by reason of their quality as a legal tender and as a medium of exchange. These limitations are due to the fact that public law gives to such coinage a value which does not attach as a mere consequence of intrinsic value. Their quality as a legal tender is an attribute of law aside from their bullion value. They bear, therefore, the impress of sovereign power which fixes value and authorizes their use in exchange."

In answer to the argument made therein on behalf of the defendant that, because silver bullion sold at a higher price in Hong Kong than the basic value of the coin in Manila, the owner of the coin was, by the legislation there involved, improperly deprived of this difference in value, the court held that legislation reasonably adequate to maintain coinage at home as a medium of exchange is not a violation of private right, and that the Philippine government not only had the power to prohibit the exportation or melting of silver coin which it had minted, but that it likewise had the power to make the violation of such a prohibition a crime.

Whilst that case can, of course, be superficially distinguished from the present case in that silver which had been already coined was there involved, and in the instant case there is involved only gold bullion which potentially might be coined or used as a basis for the issuance of gold certificates or as a basis for credit, it is not a long step to hold, as I do hold, that gold bullion must be looked at in its relation to the right to coin it into money or issue gold certificates against it, and thus to regulate the value of our currency and to maintain the credit of the United States, and that it is by title 1 of the Act of March 9, 1933, implicitly declared to be affected with a public interest.

A zone of governmental action which has been delegated to the federal government under the Constitution, as has been the zone of money and currency and federal government credit, the sovereign power of Congress, subject to the limitations contained in the Constitution itself, is in all aspects as plenary as would be the power of the Legislature of a unitary government, such as Great Britain, or one of our states, and the ambit of that power is broad enough to achieve any objective which in the opinion of Congress is necessary, not only for governmental action strictly within that zone, but also for such governmental action as will protect the boundaries of that zone from interference either by

the states or by private persons subject to the jurisdiction of the United States, whether citizens of the several states or not.

A most notable instance of the exercise, in the zone of governmental action here under discussion, of such measures as were deemed by Congress to be protective of its power over the currency, is to be found in the Act of July 13, 1866 (14 Stat. 146, § 9), which provided that "every national banking association, State bank, or State banking association, shall pay a tax of ten per centum on the amount of notes of any person, State bank, or State banking association, used for circulation and paid out by them after the first day of August, eighteen hundred and sixty-six," and thus drove state bank notes out of circulation.

The constitutionality of this act under the power of Congress over the currency was sustained by the Supreme Court in the case of Veazie Bank v. Fenno, 8 Wall. 533, 539, 548–549, 19 L. Ed. 482, mentioned above, which seems to me to be perhaps the aptest case with which to point my moral, for it was an approved instance of taking a measure of preparedness and protection to safeguard the future of our national currency just as is the act of March 9, 1933. For in Veazie Bank v. Fenno, 8 Wall. 533, 19 L. Ed. 482 (1869), Chief Justice Chase, in dealing with the same powers granted by the Constitution as are before me here, said at pages 548 and 549 of 8 Wall.:

"These powers, until recently, were only partially and occasionally exercised. Lately, however, they have been called into full activity, and Congress has undertaken to supply a currency for the entire country." Page 548 of 8 Wall.

"Having thus, in the exercise of undisputed constitutional powers, undertaken to provide a currency for the whole country, it cannot be questioned that Congress may, constitutionally, secure the benefit of it to the people by appropriate legislation. To this end, Congress has denied the quality of legal tender to foreign coins, and has provided by law against the imposition of counterfeit and base coin on the community. To the same end, Congress may restrain, by suitable enactments, the circulation as money of any notes not issued under its own authority. Without this power, indeed, its attempts to secure a sound and uniform currency for the country must be futile." Page 549 of 8 Wall.

It surely cannot be doubted, in view of that decision, that Congress has the power to investigate throughout the nation the whereabouts of gold bullion or gold coin, to require reports thereof, or to make regulations to the extent of prohibiting private hoards thereof.

That is what Congress has provided for in section 2, title 1, of the Act of March 9, 1933 (50 USCA Appendix § 5).

I hold, therefore, for the reasons above given, that it was within the power of Congress to pass section 2 of title 1 of the Act of March 9, 1933, and that by said section gold coin and gold bullion and by necessary implication gold certificates also were as effectively declared to be affected with a public interest as if Congress in its preamble to the act had used those precise words.

VII. By section 3 of title 1 of the Act of March 9, 1933, Congress has authorized the Secretary of the Treasury, whenever in his judgment such action is necessary to protect the currency system of the United States, to requisition all gold coin, gold bullion, and gold certificates owned by persons under the jurisdiction of the United States.

By this section the Secretary of the Treasury is the official authorized to exercise the power of eminent domain in respect of gold, and it is necessary to consider whether Congress had the power to exercise the right of eminent domain on gold as therein prescribed.

I have already dealt with the ambit of the power of Congress under the currency provisions, and have held that section 2 of title 1 of the Act of March 9, 1933, by necessary implication, declared gold coin, gold bullion, and gold certificates to be affected with a public interest.

The incidence of the right of eminent domain, as will be seen from what is hereinafter said, is not, however, limited to commodities affected with public interest, but involves the right of the government to take private property of any kind when it is deemed necessary, by the appropriate authority, for the public good. The powers delegated to the Secretary of the Treasury under section 3 of title 1 (12 USCA § 248 (n) are different from those delegated to the President under section 2 of the act.

Within any zone of government action in which plenary power has been granted by the Constitution to the federal government, the federal government has all the inherent powers of sovereignty. Among the powers inherent in every sovereign is the power of eminent domain.

Under the Constitution the power of eminent domain means the right to take property for public use on payment, under the provisions of the Fifth Amendment, of just compensation for its value determined as of the time and the place of its taking.

The right of eminent domain is described in Kohl v. United States, 91 U. S. 367, 371, 23 L. Ed. 449, as an "offspring of political necessity"; and as "inseparable from sovereignty, unless denied to it by its fundamental law." In that case the court aptly observed that the provision of the Fifth Amendment, to the effect that private property should not be taken for public use without just compensation, was in itself an implied recognition of the existence of the power of eminent domain in the federal government in the zones of governmental action delegated to it by the Constitution.

In United States v. Jones, 109 U. S. 513, Mr. Justice Field said at pages 518-519, 3 S. Ct. 346, 350, 27 L. Ed. 1015: "The power to take private property for public uses, generally termed the right of eminent domain, belongs to every independent government. It is an incident of sovereignty, and, as said in Mississippi R. River Boom Co. v. Patterson, 98 U. S. 403, 406 [25 L. Ed. 206], requires no constitutional recognition. The provision found in the fifth amendment to the federal constitution, and in the constitutions of the several states, for just compensation for the property taken, is merely a limitation upon the use of the power. It is no part of the power itself, but a condition upon which the power may be exercised. It is undoubtedly true that the power of appropriating private property to public uses vested in the general government—its right of eminent domain, which Vattel defines to be the right of disposing, in case of necessity and for the public safety, of all the wealth of the country—cannot be transferred to a state any more than its other sovereign attributes; and that, when the use to which the property taken is applied is public, the propriety or expediency of the appropriation cannot be called in question by any other authority."

The power of eminent domain extends to all kinds of property without exception, whether real or personal, tangible or intangible. The court said in United States v. Lynah, 188 U. S. 445, at page 465, 23 S. Ct. 349, 355, 47 L. Ed. 539:

"All private property is held subject to the necessities of government. The right of eminent domain underlies all such rights of property. The government may take personal or real property whenever its necessities, or the exigencies of the occasion, demand. So, the contention that the government had a paramount right to appropriate this property may be conceded, but the Constitution in the 5th Amendment guarantees that when this governmental right of appropriation—this asserted paramount right—is exercised it shall be attended by compensation.

"The government may take real estate for a postoffice, a courthouse, a fortification, or a highway; or in time of war it may take merchant vessels and make them part of its naval force. But can this be done without an obligation to pay for the value of that which is so taken and appropriated? Whenever in the exercise of its governmental rights it takes property the ownership of which it concedes to be in an individual, it impliedly promises to pay therefor. Such is the import of the cases cited as well as of many others."

On the condition of payment of just compensation, property of many kinds have been requisitioned by the federal government under the power of eminent domain, and various methods have been used in its exercise of that power. The questions in which such requisitions have been concerned have usually come up only in cases involving the amount of compensation to be paid; for the right to requisition has, as far as I know, been unchallenged at least in the sense that it is challenged here. Instances of property taken by the federal government are: Coal, by the Navy, United States v. New River Collieries Company, 262 U. S. 341, 43 S. Ct. 565, 67 L. Ed. 1014; a bridge and the franchise therefor, by the War Department to improve a waterway, Monongahela Navigation Company v. United States, 148 U. S. 312, 13 S. Ct. 622, 37 L. Ed. 463; a site for a nitrate plant, by the War Department, Campbell v. United States, 266 U. S. 368, 370, 45 S. Ct. 115, 69 L. Ed. 328; land for lighthouses, by the Treasury Department, Chappell v. United States, 160 U. S. 499, 16 S. Ct. 397, 40 L. Ed. 510; contracts for the construction of ships by the President under the Emergency Shipping Act of June 15, 1917 (see 40 Stat. 182), Brooks Scanlon Corporation v. United States, 265 U. S. 106, 44 S. Ct. 471, 68 L. Ed. 934; Russian Volunteer Fleet v. United States, 282 U. S. 481, 51 S. Ct. 229, 75 L. Ed. 473, and Dutch merchant vessels in our ports seized by the President in 1917 during the World War. There has not been, so far as I am aware, any litigation in our courts over such seizure because this extreme exercise of the sovereign's right of eminent domain is recognized under

international law in time of war and is therein called the right of angary. Pitt Cobbett's Cases on International Law (4th Ed.) vol. II, pp. 384–387.

Unusual, but illustrative, instances of property becoming subject to the exercise of the right of eminent domain by a declared public policy are found in the following cases wherein the exercise of eminent domain by one of the states was approved by the Supreme Court: Wells and appurtenances of a privately owned water supply company, Long Island Water-Supply Co. v. Brooklyn, 166 U. S. 685, 693, 17 S. Ct. 718, 41 L. Ed. 1165; land for ditches, Fallbrook Irrigation District v. Bradley, 164 U. S. 112, 159, 17 S. Ct. 56, 41 L. Ed. 369; Clark v. Nash, 198 U. S. 361, 369, 25 S. Ct. 676, 49 L. Ed. 1085, 4 Ann. Cas. 1171; a right of way to a mine, Strickley v. Highland Boy Mining Co., 200 U. S. 527, 531, 26 S. Ct. 301, 50 L. Ed. 581, 4 Ann. Cas. 1174; and even minority shares of stock in a Railway Company, Offield v. N. Y., N. H. & H. R. R. Co., 203 U. S. 372, 377, 27 S. Ct. 72, 51 L. Ed. 231.

The kind of property to be taken by the federal government under its right of eminent domain in one of its delegated plenary zones of governmental action and the method in which it is to be taken is, therefore, purely a legislative question. Monongahela Navigation Company v. United States, 148 U. S. 312, 325, 327, 13 S. Ct. 622, 37 L. Ed. 463.

The taking of private property for public use need not be in pursuance of a condemnation proceeding, nor need it be preceded or even accompanied by payment of compensation. Campbell v. United States, 266 U. S. 368, 370, 371, 45 S. Ct. 115, 69 L. Ed. 328; Joslin Company v. Providence, 262 U. S. 668, 677, 43 S. Ct. 684, 67 L. Ed. 1167; Dohany v. Rogers, 281 U. S. 362, 366, 50 S. Ct. 299, 74 L. Ed. 904, 68 A. L. R. 434; Hurley v. Kincaid, 285 U. S. 95, 104, 52 S. Ct. 267, 76 L. Ed. 637, because, irrespective of any statutory provision for such payment, the United States, when it takes private property from its owner for public use, impliedly contracts to make just compensation therefor by reason of the provisions of the Fifth Amendment, Russian Volunteer Fleet v. United States, 282 U. S. 481, 489, 51 S. Ct. 229, 75 L. Ed. 473, and cases there cited; Campbell v. United States, 266 U. S. 368, 370, 371, 45 S. Ct. 115, 69 L. Ed. 328; Portsmouth Harbor Land & Hotel Co. v. United States, 260 U. S. 327, 330, 43 S. Ct. 135, 67 L. Ed. 287; United States v. Cress, 243 U. S. 316, 329, 37 S. Ct. 380, 61 L. Ed. 746; United States v. Lynah, 188 U.

S. 445, 465, 23 S. Ct. 349, 47 L. Ed. 539; United States v. Great Falls Mfg. Co., 112 U. S. 645, 656, 5 S. Ct. 306, 28 L. Ed. 846.

But in order that a contract for just compensation may be implied, the property in question must be taken by the government official authorized by Congress to take it, or by his duly authorized deputy. United States v. North American Company, 253 U. S. 330, 333, 40 S. Ct. 518, 64 L. Ed. 935.

What amounts to just compensation is, of course, a matter for judicial determination in each case. Monongahela Navigation Company v. United States, 148 U. S. 312, 327, 13 S. Ct. 622, 37 L. Ed. 463.

Therefore, the provisions of section 3 of title 1 of the Act of March 9, 1933 (12 USCA § 248 (n), authorizing requisition of gold by the Secretary of the Treasury, when in his judgment it may become necessary to protect the currency system, is a valid exercise by Congress of a power necessarily incidental to its currency power.

The interrelation between section 2 and section 3 of title 1 of the Act of March 9, 1933, will be hereinafter discussed.

VIII. As I am satisfied that Congress had the right to enact title I of the Act of March 9, 1933, under its power over the currency, I now turn to a consideration of the question whether title 1 of the Act of March 9, 1933, could be held unconstitutional, not for lack of power in Congress to pass it, but owing to the form thereof, by which Congress delegates its regulatory and requisitioning powers over gold to the President and to the Secretary of the Treasury, respectively, by sections 2 and 3.

It is one of the principal arguments put forward by Campbell that Congress, in section 2 of title 1 of said act, to which only he was addressing his argument, did not legislate but merely delegated legislative power to the President. For the reasons hereinafter stated I do not think this is true.

A careful consideration of that title shows clearly, I think, that it satisfies the requirement of legislation followed by delegation and does not constitute a pure delegation of legislative authority to the President.

In the first place, Congress declared that a serious emergency existed on March 9, 1933, and amended the Act of October 6, 1917, by inserting the words italicized in the following quotation so that section 5, subdivision (b) thereof, should read (italics mine): "(b) During time of war *or during any other pe-*

*riod of national emergency declared by the President,* the President may, through any agency that he may designate, or otherwise, investigate, regulate, or prohibit, under such rules and regulations as he may prescribe, by means of licenses or otherwise, any transactions in foreign exchange, transfers of credit between or payments by banking institutions as defined by the President, and export, hoarding, melting, or earmarking of gold or silver coin or bullion or currency, by any person within the United States or any place subject to the jurisdiction thereof; and the President may require any person engaged in any transaction referred to in this subdivision to furnish under oath, complete information relative thereto, including the production of any books of account, contracts, letters or other papers, in connection therewith in the custody or control of such person, either before or after such transaction is completed. * * * " 50 USCA Appendix § 5.

It is implicit in this section of title 1 of the Act of March 9, 1933, as a declaration of policy by Congress, that, in time of war or any other period of national emergency recognized and declared by the President, the "export, hoarding, melting, or earmarking of gold or silver coin or bullion or currency, by any person within the United States or any place subject to the jurisdiction thereof" may be investigated, regulated, or, if necessary, prohibited; and by the section in question Congress appointed the President to carry out that policy by making such rules and regulations, by means of licenses or otherwise, as he might deem appropriate to the particular situation which he found facing the government in the emergency.

Section 2 (50 USCA Appendix § 5) also provided that any person engaged in any transaction with regard to the "export, hoarding, melting, or earmarking of gold or silver coin or bullion or currency" could be required by the President to furnish by returns under oath complete information relative thereto, including the production of books and papers if necessary.

It seems to me that this act meets all the requirements of legislation by Congress on the subject-matter involved, for it stated a policy, to be contingently followed, and also provided the plasticity necessary in the enforcement of that policy by the delegation of regulating power in the field covered by the policy.

In Mutual Film Corporation v. Ohio Industrial Commission, 236 U. S. 230, it was said at page 245, 35 S. Ct. 387, 392, 59 L. Ed. 552,

Ann. Cas. 1916C, 296: "While administration and legislation are quite distinct powers, the line which separates exactly their exercise is not easy to define in words. It is best recognized in illustrations. Undoubtedly the legislature must declare the policy of the law and fix the legal principles which are to control in given cases; but an administrative body may be invested with the power to ascertain the facts and conditions to which the policy and principles apply. If this could not be done there would be infinite confusion in the laws, and in an effort to detail and to particularize, they would miss sufficiency both in provision and execution."

The delegation to the executive of power to make rules and regulations has been recognized as proper almost from the beginning of our government. In the case of Field v. Clark, 143 U. S. 649, between pages 681 and 693, 12 S. Ct. 495, 500–504, 36 L. Ed. 294, the Supreme Court reviewed the acts of Congress beginning with the Ship Embargo Act of June 4, 1794 (1 Stat. 372), in which such delegation had been made.

Later instances of delegated power which have come before and been sustained by the Supreme Court are found in Chappell v. United States, 160 U. S. 499, 510, 16 S. Ct. 397, 40 L. Ed. 510; Buttfield v. Stranahan, 192 U. S. 470, 496, 24 S. Ct. 349, 48 L. Ed. 525; Union Bridge Company v. United States, 204 U. S. 364, 377–388, 27 S. Ct. 367, 51 L. Ed. 523; Hannibal Bridge Company v. United States, 221 U. S. 194, 205, 31 S. Ct. 603, 55 L. Ed. 699; Wisconsin v. Illinois, 278 U. S. 367, 414, 49 S. Ct. 163, 73 L. Ed. 426; United States v. Grimaud, 220 U. S. 506, 515–522, 31 S. Ct. 480, 55 L. Ed. 563; McKinley v. United States, 249 U. S. 397, 399, 39 S. Ct. 324, 63 L. Ed. 668; Avent v. United States, 266 U. S. 127, 129, 45 S. Ct. 34, 69 L. Ed. 202; Hampton & Co. v. United States, 276 U. S. 394, 406, 48 S. Ct. 348, 72 L. Ed. 624.

█ It is also now settled that a regulation made within the mandate of such delegated power may be the basis of criminal proceedings. United States v. Grimaud, 220 U. S. 506, 31 S. Ct. 480, 55 L. Ed. 563; McKinley v. United States, 249 U. S. 397, 39 S. Ct. 324, 63 L. Ed. 668; Avent v. United States, 266 U. S. 127, 45 S. Ct. 34, 69 L. Ed. 202; Hampton & Co. v. United States, 276 U. S. 394, 409, 48 S. Ct. 348, 72 L. Ed. 624.

In the section presently under discussion, Congress has fixed, as the limit of punishment to be given in criminal proceedings for the breach by a natural person of such a regula-

tion as the President may make under said section, a fine of $10,000 or imprisonment for not more than ten years, or both, and has extended the same liability to any officer, director, or agent of a corporation who participates in such a violation.

Thus we have the policy and the punishment in the statute, with the details to be filled in by the mandatory.

I, therefore, hold that the method by which Congress, both in section 2 and section 3 of title 1 of the Act of March 9, 1933, chose to exercise the aspect of its currency power here under consideration was a proper legislative exercise of that power accompanied by a proper delegation to the executive as to the time and manner of the exercise thereof.

■ IX. In dealing with the point raised by the defendant Campbell that the executive orders made by the President under section 2 of title 1 of the Act of March 9, 1933, were not authorized thereby, it is necessary to make a further analysis of that act.

The Act of March 9, 1933, had a scope much wider than the single section thereof, section 2, on which the argument in this case has been focused. It contains five titles, though we are concerned in the instant case only with the first title, and of that title only with sections 2 and 3.

In section 2 of title 1 (50 USCA Appendix § 5), after broadening the emergency provisions of the Trading with the Enemy Act of October 8, 1917, by adding the words "or during any other period of national emergency declared by the President," the President is given power through any agency he may designate to "investigate, regulate, or prohibit," under such rules as he may make, certain expectable forms of transactions in gold coin, gold bullion or currency. The President is further authorized to require reports under oath of all the transactions mentioned in the earlier part of section 2. Among the transactions named in section 2 is hoarding.

By section 3 of title 1 a new subsection (n) is added to section 11 of the Federal Reserve Act (12 USCA § 248 (n), and this new subsection, so far as we are presently concerned, gives to the Secretary of the Treasury power and authority whenever in his judgment it shall be "necessary to protect the currency system of the United States," to requisition gold coin, gold bullion, or gold certificates, and pay the owners therefor "an equivalent amount of any other form of coin or currency coined or issued under the laws of the United States."

A sanction deemed appropriate by Congress is contained in section 2 to insure compliance with such regulations as might be issued by the President thereunder; and another and different sanction deemed appropriate by Congress is contained in section 3 to insure compliance with such regulations for the requisition of gold as might be made by the Secretary of the Treasury under that section.

Summarized, in so far as it touches this case, the rationale of title 1 of the Act of March 9, 1933, is this:

Congress has constituted two mandatories whose mandates are complementary, but mutually exclusive.

In section 2, the President is given the authority to require returns from hoarders of gold bullion, and to investigate, regulate, or prohibit the hoarding thereof.

In section 3, the Secretary of the Treasury has authority to requisition gold bullion owned by any person or corporation, and, on surrender thereof to the Treasury, to pay therefor in a prescribed fashion.

Thus, if I may so express it, the President's mandate is to act in personam as to those who own, possess, or deal in gold bullion; and the Secretary of the Treasury is authorized to act in rem on the gold itself.

During the oral argument attention was focused only on section 2 of title 1 of the Act of March 9, 1933, under which the Executive Orders of the President of April 5, 1933, and August 28, 1933, purport to have been issued, and the gold regulations of the Secretary of the Treasury, authorized by section 9 of the Executive Order of August 28, 1933, also purport to have been made. Cf. Recital Paragraphs of Orders and Regulations.

Consequently, when we come to this branch of the consideration of the case we are involved in questions of the law of agency, and I have to decide whether section 3 of the Executive Order of August 28, 1933, providing for returns by owners of gold bullion, and section 5 of the said order, providing that after thirty days from August 28, 1933, no person shall hold in his possession or retain any interest, legal or equitable, in any gold bullion, are within the authority of the mandate given by Congress to the President under section 2 of title 1 of the Act of March 9, 1933.

This must be determined because section 3 of the Executive Order of August 28, 1933, is the basis of the first count of the superseding indictment against the defendant Campbell,

and section 5 of the said order is the basis for the second count.

It is perfectly obvious, of course, that any regulation made by the President outside of the mandate given to him by Congress would be invalid and could not be made the basis either of civil or criminal action against a citizen.

I hold that the President's authority, under section 2 of title 1 of the Act of March 9, 1933, to require, as he has, by section 3 of the Executive Order of August 28, 1933, returns by persons owning gold, is unimpeachable. The statute is explicit, and the executive order does not go outside the mandate of the statute.

■ Turning now to the regulation made under section 5 of the Executive Order of August 28, 1933, prohibiting every person after thirty days from the date of the order from holding in his possession or retaining any interest, legal or equitable, in any gold bullion situated in the United States, I think it is clear that the persons who drafted that executive order for the President's signature went outside the Congressional mandate of section 2 of title 1 of the Act of March 9, 1933, which gave the President authority to investigate, regulate, or prohibit—under such rules and regulations as he might prescribe by means of licenses or otherwise—inter alia, the hoarding of gold bullion.

It seems to me that authority to regulate or prohibit an act such as hoarding, or the continuance thereof, cannot be considered to authorize the requirement of section 5 of the executive order that the owner of the gold must yield up his interest therein and title thereto. That requirement is neither a regulation nor a prohibition, but a requisition. It must always be remembered that the power to requisition gold bullion delegated by Congress was lodged only in the Secretary of the Treasury under section 3 of title 1 of the Act of March 9, 1933, and not in the President under section 2 thereof, and that the Secretary of the Treasury has not acted yet under the powers so given-to him which I have above found to have been inherent in the currency power of Congress.

Moreover, section 5 of the Executive Order of August 28, 1933, does not prohibit an act but seeks to prohibit a status, viz., ownership, and purports to act in rem against the gold.

The result of section 5 is to put every one who owns gold bullion in this perplexing predicament:

If, on the one hand, he surrenders title to his gold bullion in pursuance thereof, he surrenders it at the behest of an official who is not authorized by Congress to requisition gold bullion, and, consequently, there would not be any implied contract on the government's part to pay for it. Thus the owner of the gold bullion would lose it without being able to sue the government under an implied contract. He would not, of course, be able to sue the government in tort.

If, on the other hand, he does not surrender his title, he is open to the penalty attached to a breach of the regulations, of imprisonment or fine, or both.

To lose his gold if he complies and to be imprisoned and fined if he does not is surely not a fair alternative to set before a citizen; for, at least, his will should be free when he is tempted to commit what has been denounced by his government as a crime.

It seems to me quite clear, therefore, that section 5 of the Executive Order of August 28, 1933, is, in effect, confiscatory and an unconstitutional method of enforcing the powers of Congress properly relied on to sustain the statute under discussion, because compensation could not be legally enforced by the person from whom the gold bullion was taken, and could only be secured through an act of grace by the government which, if ever exercised, history shows might be many years delayed.

In this connection the case of United States v. North American Company, 253 U. S. 330, 40 S. Ct. 518, 64 L. Ed. 935, is instructive, for that case involved in the first instance a seizure by a government officer who had not authority to make it. The situation in that case was that on July 1, 1900, General Randall of the United States Army, commanding the Department of Alaska, took possession of a large tract of public land as a site for an army post. The land taken included a mining claim, admittedly owned by the North American Company. The company yielded possession of that part of the public land lawfully occupied by it with its mining claim, because it was unable to withstand General Randall's authority. At the same time it demanded compensation which General Randall promised would be paid. Thereafter, he recommended to the Secretary of War the use of the site as an army post. Pursuant to the recommendation, passed on by the Secretary to the President, the latter, on December 8, 1900, issued an order by which the tract was reserved from sale and set aside for military purposes; and on December 20, 1900, the

Secretary of War announced it as a public reservation under the control of the War Department. The tract of land had been continuously used as an army post since possession of it was first taken by General Randall, and the North American Company after that time was unable to operate its claim or do any further mining work thereon.

The case went to the Supreme Court on cross-appeals from the Court of Claims. 53 Ct. Cl. 424. The United States appealed against the judgment allowing any compensation to the North American Company, and the North American Company appealed on the ground that it had not been compensated in the allowance made by the Court of Claims for the use and occupation of the land by the United States prior to the passage of title thereto.

The main question involved on the government's appeal was whether the right of action had first accrued within six years prior to the filing of the petition of the Court of Claims, as required by section 156 of the Judicial Code, title 28, United States Code, § 262 (28 USCA § 262), and the decision thereof turned on the nature of the taking by the government when General Randall first ousted the North American Company.

It was held by the Supreme Court that the action of General Randall in taking possession of the land in the first instance was tortious, because it was the Secretary of War, and not a general commanding a department, who had the right to seize land for the War Department; and that, consequently, there was no liability on the government to make just compensation *until General Randall's action had been approved and adopted by the Secretary of War,* and that, since the approval by the Secretary of War had come within six years before the commencement of suit, the suit was not barred by section 156 of the Judicial Code (28 USCA § 262).

Mr. Justice Brandeis wrote the opinion of the court and said at page 333 of 253 U. S., 40 S. Ct. 518, 519:

"When the government, without instituting condemnation proceedings, appropriates for a public use under legislative authority private property to which it asserts no title, it impliedly promises to pay therefor. United States v. Great Falls Manufacturing Co., 112 U. S. 645, 5 S. Ct. 306, 28 L. Ed. 846; United States v. Lynah, 188 U. S. 445, 462, 465, 23 S. Ct. 349, 47 L. Ed. 539; United States v. Cress, 243 U. S. 316, 329, 37 S. Ct. 380, 61 L. Ed. 746. But, although Congress may have conferred upon the Executive Department power to take land for a given purpose, the government will not be deemed to have so appropriated private property, merely because some officer thereafter takes possession of it with a view to effectuating the general purpose of Congress. See Ball Engineering Co. v. J. G. White & Co., 250 U. S. 46, 54–57, 39 S. Ct. 393, 63 L. Ed. 835. In order that the government shall be liable it must appear that the officer who has physically taken possession of the property was duly authorized so to do, either directly by Congress or by the official upon whom Congress conferred the power.

"The Acts of March 3, 1899, c. 423, 30 Stat. 1064, 1070, and of May 26, 1900, c. 586, 31 Stat. 205, 213, making appropriations for barracks and quarters for troops, furnish sufficient authorization from Congress to take land for such purposes, so that the difficulty encountered by the claimant in Hooe v. United States, 218 U. S. 322, 31 S. Ct. 85, 54 L. Ed. 1055, does not exist here. But the power granted by those acts was conferred upon the Secretary of War. Act Aug. 1, 1888, c. 728, § 1, 25 Stat. 357 [40 USCA § 257]; Act Aug. 18, 1890, c. 797, § 1, 26 Stat. 316 [50 USCA § 174]. It was for him to determine whether the army post should be established and what land should be taken therefor. Compare Nahant v. United States, 70 C. C. A. 641, 136 F. 273, 69 L. R. A. 723; U. S. v. Town of Nahant, 82 C. C. A. 470, 153 F. 520; United States v. Certain Lands in Narragansett, R. I. (C. C.) 145 F. 654. Power to take possession of the company's mining claim was not vested by law in Gen. Randall; and the Secretary of War had not, so far as appears, either authorized it or approved it before December 8, 1900. It was only after the President reserved from sale and set aside for military purposes the large tract of land in which the company's mining claim was included that the Secretary of War took action which may be deemed an approval or ratification of what Gen. Randall had done. What he had done before that date having been without authority, and hence tortious, created no liability on the part of the government. Hijo v. United States, 194 U. S. 315, 323, 24 S. Ct. 727, 48 L. Ed. 994. Since the cause of action arose after December 7, 1900, this suit was not barred by section 156 of the Judicial Code [28 USCA § 262]."

The so-called gold regulations by the Secretary of the Treasury made September 12, 1933, do not put the authority of the Secretary of the Treasury behind this requisition because they are made under the Executive

Order of August 28, 1933, which is based on section 2 of title 1 of the Act of March 9, 1933, and were not made under section 3, which is the only section which gives to the Secretary of the Treasury the power of requisitioning gold. Furthermore, they do not comply or purport to comply with the provisions of that section with regard either to the reimbursement of the gold owner or the persons to whom the surrender of his title is to be made.

I hold, therefore, that, by section 5 of the Executive Order of August 28, 1933, the President stepped outside of the zone of the mandate given to him by Congress in section 2 of the Act of March 9, 1933, to investigate, regulate, or prohibit the hoarding of gold bullion, and into the zone of his fellow mandatory, the Secretary of the Treasury, because he provided by section 5 of his said executive order for what is, in effect, the requisition of gold bullion either as incidental to a prohibition against the hoarding thereof or as a means of insuring the enforcement of such prohibition. Section 5 of the Executive Order of August 28, 1933, is, therefore, invalid.

It follows from what I have said above that the demurrer to the second count of the superseding indictment must be sustained, and said count, accordingly, will be dismissed.

The demurrer to the first count of the superseding indictment must now be considered further in connection with other contentions, based on the Constitution, which have been made by the defendant Campbell.

X. Inasmuch as the demurrer to the second count of the indictment has been successfully challenged on the grounds above stated, we are hereinafter concerned only with the first count of the superseding indictment.

The defendant Campbell argues that the term "hoarding," used in the Executive Order of August 28, 1933, is too vague, uncertain, and indefinite to constitute the basis of any criminal proceeding against him.

In connection with this argument I must point out that he is not indicted for hoarding. He has been indicted, under the first count of the indictment, for failing to make a return as section 3 of the President's Executive Order of August 28, 1933, required him to do, of the gold bullion which he owned. Such an accusation surely is not so vague, uncertain, and indefinite as to make the defendant unable to plead thereto.

But quite aside from the direct basis of the first count of the indictment, and assum-

5 F.SUPP.—12

ing that it must be held necessarily referable back to the word "hoarding" contained in section 2 of title 1 of the Act of March 9, 1933, I entirely disagree with the defendant as to his contention that the word "hoarding" has not a clear and definite meaning.

The Oxford English Dictionary defines the verb "to hoard" as meaning: "To amass and put away (anything valuable) for preservation, security or for use; to treasure up; especially money or wealth."

Examples of the use of the verb "to hoard," from the year 1000 A. D. up to the end of the nineteenth century, are given. Among them are the following:

"1615.—G. Sandys. Trav. 136.—'The Granaries of Joseph: wherein he hoarded corne.'"

"1840.—Hood. Kilmansegg, Moral.— 'Gold! Gold! Gold! Gold!—Hoarded, bartered, bought and sold.'"

"1878.—Jevons. Prin. Pol. Econ. 22.— 'If the rich man actually hoards up his money in the form of gold or silver, he gets no advantage from it.'"

The same dictionary defines the word "hoarding" as "the action of the verb to hoard, especially the accumulation and hiding of money," and gives as examples of its use:

"1593. Shaks. 3 Hen VI II ii 48.—'And happy always was it for that Sonne Whose Father for his hoarding went to hell.'"

"1639. W. Whateley. Prototypes III, XXXIX, (1640) 16.—'Such hoarding is no oppression but good husbandry.'"

"1845. Ford. Hanbk. Spain I, 5.—'In self defence they are much addicted to hoarding.'"

The word "hoarding" was held sufficiently clear to be the foundation for a criminal conviction under the so-called Lever Act of August 10, 1917 (40 Stat. 278), section 6 of which makes the hoarding of necessaries a criminal offense. United States v. Swedlow (D. C.) 264 F. 1016–1018; Merritt v. United States, 264 F. 870 (C. C. A. 9).

It should, perhaps, be noted that in the Merritt Case, after the certiorari was granted, 255 U. S. 567, 41 S. Ct. 375, 65 L. Ed. 789, the case was reversed on confession of error by the Solicitor General, 255 U. S. 579, 41 S. Ct. 375, 65 L. Ed. 795. The reason for the confession does not appear in the reports, but it is therein recorded that the cause was remanded to the District Court for the Southern District of California for further pro-

ceedings, from which notation it would seem that the reversal did not turn on the ground of the vagueness of the word "hoarding" which would have been fatal to the case and would have resulted presumably in a reversal.

But, however that may be, there is not any doubt that the Swedlow Case went flatly on the word "hoarding" and did not depend on the attempted definition thereof in the Lever Act. Apparently the Swedlow Case was never appealed.

It seems to me that none of the cases cited by the defendant on this branch of his argument are in point here. All that is required in point of definiteness in a criminal case is that either from the text of the statute involved or the subjects with which it deals a standard of some sort is afforded. United States v. L. Cohen Grocery Company, 255 U. S. 81, 41 S. Ct. 298, 65 L. Ed. 516, 14 A. L. R. 1045.

Being a believer in the axiom that actions speak louder than words, I also add that, when Campbell brought his suit in equity against the Chase National Bank, he implicitly construed himself as having been a hoarder of gold bullion and sought to escape the penalty therefor on the ground that the statute and the executive orders under which the government was threatening to act against him were unconstitutional and invalid.

XI. Among the grounds for the demurrer to the first count of the superseding indictment and the argument in support thereof made by the defendant Campbell is the contention that the requirement of section 3 of the Executive Order of August 28, 1933, for a return by every person in possession of or owning gold coin, gold bullion, and gold certificates, containing true and complete information relative thereto, would, if he had complied therewith, have forced him to incriminate himself under the Executive Order of April 5th, which required, with certain exceptions not covering the defendant's situation, all persons then owning gold coin, gold bullion, and gold certificates, or coming into ownership thereof on or before April 28, 1933, to deliver such coin, bullion, and certificates to a Federal Reserve Bank, an agency thereof, or a member bank of the Federal Reserve system on or before May 1, 1933. This was a clear requisition order made under section 2 of the Act of March 9, 1933, and invalid because it was not made by the official to whom Congress had delegated requisitioning power; but, quite aside from this consideration, the answer to Campbell's conten-

tion is that the law embodied in the executive order required the defendant Campbell to file the return, and, if he wished to challenge the right of the government to any of the information requested of him in the return, he should have done so on his return, instead of abstaining from making one. United States v. Sullivan, 274 U. S. 259, 47 S. Ct. 607, 71 L. Ed. 1037, 51 A. L. R. 1020.

It is clear from the case just cited that Campbell cannot properly invoke the privilege against self-incrimination contained in the Fifth Amendment as a ground for maintaining his demurrer to the first count of the superseding indictment, and the only count of the original indictment both of which charge him as an owner of gold bullion with failure to make a return thereof.

The purpose of requiring these returns is obvious: To locate accumulations of gold so that, if and when the Secretary of the Treasury came to exercise his power of requisition under section 3 of title 1 of the Act of March 9, 1933, he would know to whom requisition notices were to be sent.

I have already held above that title 1 of the Act of March 9, 1933, was a proper exercise of the power of Congress over the currency, that the requirement of returns from owners of gold bullion was within the authority vested by section 2 thereof in the President, and that the first count of the superseding indictment and the only count of the original indictment are sufficiently definite.

It follows from what I have just said, therefore, that the demurrers to the said counts must be overruled, and that the defendant Campbell must stand trial on the first count of the superseding indictment.

XII. At the beginning of this opinion I have stated my decision on the various motions in the equity cases which were before me, and also on the demurrers to the indictments. I think there is only one other question with which I should deal.

I feel that in this case the status quo should be preserved pending any appeal that may be taken either by Campbell in his equity cases, or by the United States from my dismissal of the second count of the superseding indictment. For that reason my orders overruling the demurrer to the first count of the superseding indictment and the demurrer to the only count of the original indictment must contain a provision suspending the operation of each order for a period of twenty days, during which period the parties may have an opportunity to determine whether they wish

to appeal, and, if so, to take and perfect an appeal.

If and when an appeal shall have been taken and perfected either by Campbell or by the United States, on proper application made to me, I shall make orders providing that the suspension of the operation of my orders overruling the said demurrers may be extended pending such appeal, and until further orders of this court after the mandate on such appeal shall have been sent down and filed here.

Settle all orders in all the cases on three days' notice unless the form thereof is agreed by counsel.