UNITED STATES of America,
Plaintiff,

v.

James BRIDDLE, Harold Donald
Mitchell, Defendants.

Cr. No. 30976–CD.

United States District Court
S. D. California,
Central Division.

Dec. 27, 1962.

Francis C. Whelan, U. S. Atty., Thomas R. Sheridan, Asst. U. S. Atty., Norman T. Ollestad, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff.

William Bryan Osborne, Los Angeles, Cal., for defendants.

MATHES, District Judge.

The defendants stand indicted for "holding" or possessing gold bullion in violation of 12 U.S.C. § 95a; Executive Order No. 6260, as amended; and 31 U.S.C. § 442. The provisions of 31 U.S.C. § 442 deal only with civil penalties, and so are immaterial to the criminal charge.

Sections 95a(1) and (3) of Title 12 of the United States Code, insofar as here relevant, provide that:

"(1) During the time of war or during any other period of national emergency declared by the President, the President may, through any agency that he may designate, or otherwise, and under such rules and regulations as he may prescribe, by means of instructions, licenses, or otherwise—

"(A) investigate, regulate, or prohibit any transactions in foreign exchange * * * and the importing, exporting, hoarding, melting, or earmarking of gold * * *

by any person * * * subject to the jurisdiction of the United States; * * *

"(3) * * * Whoever willfully violates any of the provisions of this subdivision or of any * * * order, rule or regulation issued thereunder, shall, upon conviction, be fined not more than $10,000, or * * * imprisoned for not more than ten years, or both; * * *." [48 Stat. 1 (1933).]

Executive Order No. 6260, issued August 28, 1933 [12 U.S.C.A. § 95a, note], provides in relevant part:

"By virtue of the authority vested in me by section 5(b) of the act of October 6, 1917 [40 Stat. 415], as amended by section 2 of the act of March 9, 1933, entitled 'An act to provide relief in the existing national emergency in banking and for other purposes,' [48 Stat. 1; 12 U.S.C. § 95a], I, Franklin D. Roosevelt, President of the United States of America, do declare that a period of national emergency exists, and by virtue of said authority and of all other authority vested in me, do hereby prescribe the following provisions for the investigation and regulation of the hoarding, earmarking, and export of gold coin, gold bullion, and gold certificates by any person within the United States or any place subject to the jurisdiction thereof; * * *.

"Sec. 5. Holding of gold coin, gold bullion, and gold certificates.— After 30 days from the date of this order no person shall hold in his possession or retain any interest, legal or equitable, in any gold coin, gold bullion, or gold certificates situated in the United States and owned by any person subject to the jurisdiction of the United States, except under license therefor issued pursuant to this Executive order; * * *.

"Sec. 10. Whoever willfully violates any provision of this Executive order or of any license, order, rule, or regulation issued or prescribed hereunder, shall, upon conviction, be fined not more than $10,000, or * * * imprisoned for not more than 10 years, or both * * *."

Defendants have moved to dismiss the indictment as not alleging a public offense, upon the ground that the 1933 Executive Order was of no legal effect on May 29, 1962—the date of the asserted offense—because the national emergency upon which the Order was predicated had long since passed.

In order to understand fully the defendants' contentions, it is necessary to review at some length the history of Executive Order No. 6260 and the statute [12 U.S.C. § 95a] which serves as the source of legal authority for that Executive Order.

On October 6, 1917, to aid prosecution of World War I, the Congress enacted the Trading with the Enemy Act of 1917.

[40 Stat. 411.] Section 5(b) of that Act then provided:

"That the President may investigate, regulate, or prohibit, under such rules and regulations as he may prescribe, by means of licenses or otherwise, any transactions in foreign exchange, export or earmarkings of gold or silver coin or bullion or currency * * * by any person within the United States; * * *." [40 Stat. 415.]

On March 4, 1933, when President Franklin D. Roosevelt took office, the nation was in the economic depths of what has been called "The Great Depression". The national economy was floundering. Banks throughout the country were closing their doors in rapid succession because they failed to meet the demands of panicked citizens seeking to exchange their currency for gold, as existing currency laws allowed. The economic conditions obtaining at this time have been documented by historians, but a contemporaneous account appears in the argument of the Attorney General in Norman v. Baltimore & O. R. R., 294 U.S. 240, 253, 55 S.Ct. 407, 79 L.Ed. 885 (1935).

To stem *inter alia* the avalanche of gold withdrawal, the President declared a "bank holiday" to last through Thursday, March 9th, 1933. [Proclamation No. 2039, 48 Stat. 1689, codified at 31 C.F.R., § 120.1.] This Proclamation declared in part that:

"During such holiday, excepting as hereinafter provided, no such banking institution or branch shall pay out, export, earmark, or permit the withdrawal or transfer in any manner or by any device whatsoever, of any gold or silver coin or bullion or currency or take any other action which might facilitate the hoarding thereof nor shall any such banking institution or branch pay out deposits, make loans or discounts, deal in foreign exchange, transfer credits from the United States to any place abroad, or trans-

act any other banking business whatsoever." [31 C.F.R. § 120.1.]

In an obviously strained effort to find legal support for such drastic and unprecedented control of the banking business of the nation, the President made reference to the "national emergency" and to authority claimed under the above-quoted provisions of the Trading with the Enemy Act of 1917. [40 Stat. § 411.] Although this action was cheerfully accepted, and even welcomed, at the time, it was clearly unauthorized, since nowhere in the Constitution is the President given authority to act in an "emergency" as such, and the requisite war conditions which might have called into play his granted power as Commander-in-Chief or his delegated power under the Trading with the Enemy Act of 1917 did not obtain.

This patent lack of authority prompted the President immediately to submit to a compliant Congress the bill which became the Act of March 9, 1933. [48 Stat. 1, 12 U.S.C. § 95a.] The temporary nature of this Act and the haste with which it was formulated and passed are evidenced by the title:

"AN ACT

"To provide relief in the existing national emergency in banking, and for other purposes.

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Congress hereby declares that a serious emergency exists and that it is imperatively necessary speedily to put into effect remedies of uniform national application."

To remedy the unauthorized nature of the President's action four days earlier in proclaiming the so-called "bank holiday", § 1 of the Act "approved and confirmed" all steps theretofore taken by him under Section 5(b) of the Trading with the Enemy Act of 1917, i. e., Proclamation No. 2039, supra. The Congress then went on to deal with the underlying problem, the withdrawal and hoard-

ing of gold. However, this problem was hastily solved, not by direct Congressional action, but through a broad delegation of power to the President. Thus § 2 of the 1933 Act amended § 5(b) of the 1917 Act to read substantially as quoted at the outset from 12 U.S.C. § 95a.

Both the power of the Congress to enact this 1933 legislation, and the validity of the delegation of power have been upheld in prior cases [see, e. g., Campbell v. Chase National Bank of the City of New York, 5 F.Supp. 156 (S.D.N.Y. 1933), appeal dismissed sub nom. United States v. Campbell, 291 U.S. 686, 54 S.Ct. 455, 78 L.Ed. 1073 (1934)], and are not now in issue.

Relying upon authority purportedly granted to him under § 2 of the Act of March 9, 1933, the President issued Executive Orders on April 5 and April 20, which ultimately were embodied in and superseded by above-quoted Executive Order No. 6260 of August 28, 1933.

The validity of Executive Order No. 6260 was quickly tested in the courts, and § 5 of this Order, quoted above, was held to exceed the authority delegated to the President. [See Campbell v. Chase National Bank of the City of New York, supra, 5 F.Supp. 156 (S.D.N.Y.1933), appeal dismissed sub nom. United States v. Campbell, 291 U.S. 686, 54 S.Ct. 455, 78 L.Ed. 1073 (1934); United States v. Driscoll, 9 F.Supp. 454 (D.Mass.1935); contra, United States v. Levy, 137 F.2d 778 (2d Cir.1943).] To nullify the holdings of these cases, even before they could be appealed, § 13 of the Gold Reserve Act of January 30, 1934 [48 Stat. 337], "approved, ratified, and confirmed" all action theretofore taken by the President under the Act of March 9, 1933. The sole purpose of § 13 was to clarify the intent of the Congress as to the scope of the delegation of power embraced within § 2 of the 1933 Act. [78 Cong. Rec. 1010 (1934) (remarks of Representative McGugin).]

The Congress did not then or thereafter enact Executive Order No. 6260 into law, and the Government does not so contend. Moreover, any such contention would be clearly untenable, because the validity of Executive Order No. 6260 must *ex statuto* rest upon the existence of some "national emergency" declared by the President.

While § 13 of the Gold Reserve Act of 1934 was not permanent in character, the remainder of the Act was. Indeed, it serves today as the basis of our present gold policy. Section 2 of the 1934 Act vested title to all monetary gold in the United States. Section 3 authorized the Secretary of the Treasury to make regulations prescribing the conditions under which gold may be "acquired and held, transported, melted or treated, imported, exported, or earmarked * * *." Section 4, by way of civil sanction, provided for forfeiture of gold held in violation of § 3, and for a personal penalty of twice the value of the gold so held. [48 Stat. 340 (1934), 31 U.S.C. § 443.] The remaining sections established procedures to govern the transition and to stabilize the value of the dollar.

Finally, § 17 of the 1934 Act provided: "All Acts and parts of Acts inconsistent with any of the provisions of this Act are hereby repealed." Any contention that § 17 served to repeal the above-quoted criminal provisions of the 1933 Act [12 U.S.C. § 95a(3)] has been rejected several times, and is not again advanced here. [See: Farber v. United States, 114 F.2d 5 (9th Cir. 1940), cert. denied, 311 U.S. 706, 61 S.Ct. 173, 85 L.Ed. 458 (1940); United States v. Chabot, 193 F.2d 287 (2d Cir. 1951); United States v. Catamore Jewelry Co., 124 F.Supp. 846 (D.R.I.1954).]

■ While the 1933 Act gave the President broad power to act in a declared "national emergency", of course that power can rise no higher than that of the Congress which delegated it. This Congressional authority, in turn, as demonstrated elsewhere [see: Campbell v. Chase National Bank of the City of New York, supra, 5 F.Supp. 156 (S.D.N.Y. 1933), appeal dismissed sub nom. United

States v. Campbell, 291 U.S. 686, 54 S.Ct. 455, 78 L.Ed. 1073 (1934)], must rest upon Article I, Section 8, Clauses 2, 5 and 18 of the Constitution, which empower the Congress:

"To borrow Money on the credit of the United States;

"To coin Money, regulate the Value thereof, and of foreign Coin,
* * *

"To make all laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."

The war powers, which furnish the Constitutional warrant for the Trading with the Enemy Act of 1917, give the Congress in time of war the authority to do anything reasonably necessary to the defense of the nation. But Executive Order No. 6260 has not even the color of legal validity stemming from Congressional delegation of war powers. It follows, therefore, that the "period of national emergency declared by the President" [12 U.S.C. § 95a] must be of an essentially economic or fiscal character, in order that the substantive remedy will have a reasonable relation to the problem, and will not exceed the bounds of the above-quoted Constitutional powers. It is equally clear that the delegation of Congressional power cannot endure beyond the period of the "national emergency" so declared.

Certainly a "national emergency" of an economic nature existed in 1933 at the time Executive Order No. 6260 was promulgated. The withdrawal and hoarding of gold threatened the nation's entire economy. It was against this panic that the Order was directed. For this reason, the Congress obviously felt that stiff criminal penalties, which were already a part of the war-time Trading with the Enemy Act of 1917, were justified by the economic crisis confronting the nation. And for this reason also the less

severe civil sanctions of the Gold Reserve Act of 1934 [31 U.S.C. § 443] were held not to have repealed the criminal penalties provided in the 1933 Act. [Farber v. United States, supra, 114 F.2d 5 (9th Cir. 1940), cert. denied, 311 U.S. 706, 61 S.Ct. 173, 85 L.Ed. 458 (1940); United States v. Chabot, supra, 193 F.2d 287 (2d Cir. 1951); United States v. Catamore Jewelry Co., supra, 124 F.Supp. 846 (D. R.I.1954).] The 1934 Act in turn was a more deliberate piece of legislation, which made a permanent change in our currency laws, and was to continue in effect long after the temporary panic had been dealt with.

It is a simple matter, of course, to date the commencement of a "national emergency" by its declaration. But unless the ending be marked by proclamation also it is sometimes difficult indeed to determine. Yet, always at some point the "national emergency" does end, and the Orders which find their authority in the existence of the emergency lose their validity. [Cf. Chastleton Corp. v. Sinclair, 264 U.S. 543, 44 S.Ct. 405, 68 L.Ed. 841 (1924).]

The defendants urge that judicial notice be taken of the ending of the 1933 economic emergency declared in Executive Order No. 6260, pointing out that although there may have been some question as late as 1940 Ruffino v. United States, 114 F.2d 696 (9th Cir. 1940)], the depression of 1933 certainly ended with the economic boom that came during and following World War II. The Government, on the other hand, insists that such a fact is not a proper subject of judicial notice, citing Bauer v. United States, 244 F.2d 794 (9th Cir. 1957).

In the Bauer case, the defendant was convicted of illegally possessing gold bullion on February 12, 1954. On appeal, his contention was the same as that presented by the defendants here—that the economic emergency giving rise to Executive Order No. 6260 no longer existed. Our Court of Appeals for the Ninth Circuit reversed the conviction and, follow-

ing what "seemed the wiser course", remanded the case to the District Court with directions to determine whether Executive Order No. 6260 was still in effect. [244 F.2d at 797.]

The Court of Appeals declined to take judicial notice that "the economic emergency which resulted in the adoption of Executive Order No. 6260, under the authority of 12 U.S.C.A. § 95a, no longer exists", pointing out that "this Court has no jurisdiction or facilities for taking evidence, if that should be required". [244 F.2d at 796, 797.]

■ To take judicial notice of a fact, even as a matter of common knowledge, is to take evidence, and it is hardly necessary to say that appellate courts do not ordinarily add to the facts of record in deciding appeals, especially in criminal cases. Hence it was not only the "wiser course", but also the proper course, for the Court of Appeals in Bauer to remand the case to the trial court for a fact determination, from evidence adduced by judicial notice or otherwise, of whether the 1933 economic emergency, which serves as the legal foundation for the validity of Executive Order No. 6260, continued to exist on the date of the offense alleged to have been committed by Bauer on February 12, 1954. [See Chastleton Corporation v. Sinclair, supra, 264 U.S. at 548–549, 44 S.Ct. at 406.]

■■ This Court has the power to receive evidence—including evidence adduced by means of judicial notice—upon the hearing of the defendants' motions to dismiss the indictment at bar. [Fed. R.Crim.P. 12(b) (4), 26.] Moreover, it is now too clear for debate, as a matter of common knowledge, that the 1933 economic emergency ended long before 1962. Accordingly, this Court should and does now judicially notice the fact. [See: Chastleton Corporation v. Sinclair, supra, 264 U.S. at 548–549, 44 S.Ct. at 406; Bauer v. United States, supra, 244 F.2d at 796–797.]

The Government urges, however, that it should be given an opportunity to present evidence that a "national emergency", sufficient to sustain the validity of Executive Order No. 6260, now exists by virtue of our present balance-of-payments-abroad deficit. This would be a futile procedure, since the President admittedly has not made the declaration which the statute requires.

Finally, the Government argues that a "national emergency" has been declared, both by President Eisenhower and by President Kennedy, which will sustain the validity of Executive Order No. 6260, and so the penal provisions of the statute. It is pointed out that on December 1, 1960, President Eisenhower issued Executive Order No. 10896 [25 F.R. 12281 (1960)] proclaiming that, in light of the continued existence of the emergency declared in Proclamation No. 2914 [15 F.R. 9029 (1950)], Executive Order No. 6260 and the gold regulations issued thereunder "are hereby approved, ratified, and affirmed and shall continue in full force and effect * * *"; also that on January 17, 1961, President Kennedy issued a similar Order [Executive Order No. 10905, 26 F.R. 321 (1961)] which also made reference to Proclamation No. 2914.

■ It may well be, as the Government contends, that each of these Executive Orders, and more especially the latter, was directed primarily against the recent outflow of gold. But rather than declaring the existence of an economic emergency necessitating Executive Order No. 6260, each is based upon Proclamation No. 2914, which was President Truman's declaration of a national emergency due to the Korean war and Communist imperialism. The Korean hostilities have long since ended. And while Communist imperialism continues to pose a threat to the nation, the existence of that struggle—that "national emergency" [12 U.S.C. § 95a]—cannot serve to prolong until almost 30 years later "The Great Depression" of 1933.

590

To hold that the existence of Communist imperialism authorizes the criminal provisions here in issue would be to condone the methods of the enemy. For if the President of the United States be permitted to create crimes by fiat and ukase, without Constitutional authority or Congressional mandate, there is little to choose between their system and ours. As Judge Fee aptly observed in Bauer v. United States:

"It seems vital as a matter of national policy that emergency regulations and almost dictatorial powers granted or conceded in the turmoil of war, cold war, economic revolution and the struggle to preserve a balanced democratic way of life, should be discarded upon return to normal conditions, lest we grow used to them as the fittings of ordinary existence. Executive regulations drafted and confirmed for an emergency should expire with the emergency. There will be time enough to revivify these if another emergency require and Congress be willing. Of course, if it seems essential to continue the subject matter of these criminal regulations now, Congress can so declare. But the power lies in Congress." [244 F.2d at 797.]

The years since the 1933 enactment of 12 U.S.C. § 95a have seen wholesale abdication of power by the Congress to the President. It is not the function of the Judicial Department to sit in judgment upon the wisdom of that trend, but it is both the function and the duty of the courts to hold the exercise of delegated Congressional powers strictly within the confines prescribed by the Congress. A multo fortiori so, where the Congress delegates to the Executive the power to make criminal what was theretofore lawful.

For the reasons stated, the defendants' motions to dismiss the indictment must be granted.