**UNITED STATES of America**
v.
**Stanley LANE and Joseph Valle, Defendants.**

United States District Court
S. D. New York.
June 6, 1963.

**460**

Robert M. Morgenthau, U. S. Atty. for the Southern Dist. of New York, for the United States; Richard C. Casey, Asst. U. S. Atty., New York City, of counsel.

Spar, Schlem & Burroughs, New York City, for defendants; Charles Spar, Leon B. Savetsky, New York City, of counsel.

SUGARMAN, District Judge.

On August 3, 1962 the grand jury for the Southern District of New York handed up a three-count indictment against the defendants Lane and Valle.

Count One charges that on or about May 23, 1962 the defendants unlawfully, wilfully and knowingly did acquire gold bullion having a value of approximately $7500 without a license therefor having been issued pursuant to Executive Order No. 6260 of the President of the United

States, dated August 28, 1933, as amended.

Count Two charges that on or about May 23, 1962 the defendants unlawfully, wilfully and knowingly did hold in their possession gold bullion having a value of approximately $7500 without a license therefor having been issued pursuant to Executive Order No. 6260 of the President of the United States, dated August 28, 1933, as amended.

Title 12 U.S.C. § 95a is cited to each said count.

Count Three charges that continuously between about May 1, 1962 and the date of the filing of the indictment the defendants unlawfully, wilfully and knowingly conspired to violate Title 31 U.S.C. §§ 440, 441, 442 and 443 and the regulations promulgated thereunder (Title 31, Subtitle B, Chapter 1, Part 54, C.F.R.) and thereby to defraud the United States in the exercise of its governmental functions of regulating the value of money, stabilizing the exchange value of the dollar and regulating and controlling the acquisition, holding, etc. of gold without a license duly issued therefor.

Title 18 U.S.C. § 371 is cited to the third count.

Assigned for trial, defendants now move to dismiss each count of the indictment as failing to state a public offense.

As to the first and second counts defendants rely upon United States v. Briddle, 212 F.Supp. 584 (S.D.Cal.1962). It appears that in that case the indictment was originally dismissed on August 16, 1962 upon a memorandum decision:

"Indictment for holding gold bullion in violation of 12 U.S.C. § 95a and Executive Order No. 6260 must be dismissed because 1933 economic emergency requisite to validity of Executive Order No. 6260 and imposition of criminal sanctions no longer exists."

On September 14, 1962 the United States filed a notice of appeal to the Supreme Court pursuant to Title 18 U.S. C. § 3731, from the said order of August

16, 1962 but on November 14, 1962 the parties stipulated, pursuant to Supreme Court Rule 14, that said appeal be dismissed. Thereafter, the court's opinion of December 27, 1962 (212 F.Supp. 584) was filed.

The indictment in Briddle differs from the instant indictment in two respects. Whereas, as above indicated, the indictment herein contains two substantive counts, one for acquiring and the second for possessing gold in violation of Title 12 U.S.C. § 95a, the indictment in Briddle contained only one count charging both acquisition and possession of gold in violation of that statute. The second difference is that there was no count in the Briddle indictment charging, as in the third count here, a conspiracy to violate Title 31 U.S.C. §§ 440–443.

If I were to follow the holding in Briddle the defendants' motion would have to be granted as to both the first and second counts of this indictment. Finding myself unable to agree with Briddle insofar as that decision affects the two substantive counts of the indictment before me, I state my reasons therefor.

After the declaration on April 6, 1917 [1] of a state of war beween the United States and Germany by the 65th Congress at its 1st Session, the Trading with the enemy Act [2] was passed on October 6, 1917 at the same session. Section 5 of the original Trading with the enemy Act, *inter alia,* provided:

"(b) That the President may investigate, regulate, or prohibit, under such rules and regulations as he may prescribe, by means of licenses or otherwise, any transactions in foreign exchange, export or earmarkings of gold or silver coin or bullion or currency, * * *."

The entire tenor of the original Trading with the enemy Act appeared to be related to the then recently declared participation by this country in World War I.

At the 2nd Session of the same Congress, Section 5(b) of the Trading with the enemy Act was on September 24, 1918 amended [3] to provide:

"That until the expiration of two years after the date of the termination of the war between the United States and the Imperial German Government * * *.

"5(b) * * * the President may investigate, regulate, or prohibit, under such rules and regulations as he may prescribe, by means of licenses or otherwise, any transactions in foreign exchange and the export, hoarding, melting, or earmarkings of gold or silver coin or bullion or currency * * *."

Thus the Trading with the enemy Act as amended in September 1918 addressed itself specifically and was limited to World War I and two years thereafter.

Long after World War I had ended and on March 9, 1933 the 73rd Congress at its 1st Session [4] further amended Section 5(b) of the Trading with the enemy Act to read:

"During time of war or *during any other period of national emergency declared by the President,* the President may, through any agency that he may designate, or otherwise, investigate, regulate, or prohibit, under such rules and regulations as he may prescribe, by means of licenses or otherwise, any transactions in foreign exchange, transfers of credit between or payments by banking institutions as defined by the President, and export, hoarding, melting, or earmarking of gold or silver coin or bullion or currency * * *." (Emphasis supplied.)

Said section was further amended to provide that:

"Whoever willfully violates any of the provisions of this subdivision or of any license, order, rule or regulation issued thereunder, shall, upon

---

1. 40 Stat. 1.

2. 40 Stat. 411.

3. 40 Stat. 965.

4. 48 Stat. 1.

conviction, be fined not more than $10,000, or, if a natural person, may be imprisoned for not more than ten years, or both; * * *."

Insofar as the acquisition and possession of gold bullion, as charged in the first two counts of the instant indictment, are concerned, it appears that President Franklin D. Roosevelt exercised the power granted by Section 5(b) of the Trading with the enemy Act as amended on March 9, 1933 by Executive Order No. 6102, promulgated on April 5, 1933.[5] That Executive Order required the delivery of gold bullion on or before May 1, 1933 to designated depositories; provided for the payment therefor in other form of United States coin or currency and for the issuance by the Secretary of the Treasury of licenses for the retention of specified gold.

On August 28, 1933 President Franklin D. Roosevelt issued Executive Order No. 6260.[6] Executive Order No. 6260, after declaring the existence of a national emergency, in Section 4 forbade, after the date of the order, with certain exceptions not here pertinent, the acquisition of gold bullion and, in Section 5 forbade, subsequent to 30 days from the date thereof, the holding or retention of any interest in gold bullion except such as the Secretary of the Treasury might permit by license. Executive Order No. 6260 revoked Executive Order No. 6102.

There can be no doubt that Executive Order No. 6260 was predicated upon a declared "national emergency in banking" and thus was promulgated not during a "time of war" but under the alternative power "during any other period of national emergency". Nor can there be any doubt that the last stated amendment to the Trading with the enemy

Act upon which Executive Order No. 6260 was based was hurriedly enacted to meet that emergency,[7] at an extra session of Congress[8] convened on the last day of the bank holiday proclaimed by the President on March 6, 1933.[9]

If the foregoing history were all that is involved in considering defendants' present motion, their argument might be persuasive that, as to the first two counts of the indictment, as held in Briddle, supra, such national emergency in banking was no longer extant on May 23, 1962 and their acquisition and possession of gold bullion on that day did not constitute a criminally punishable public offense. But, it is not because later events are apposite.

On December 16, 1950 President Harry S. Truman issued Proclamation No. 2914[10] "proclaiming the existence of a national emergency". Declaring that "recent events in Korea and elsewhere" and "world conquest by communist imperialism" constituted a present threat to the liberties and economic advantages enjoyed by the people of this country under a free democratic society, he rallied "the full moral and material strength of the Nation" to readiness to meet the threatening danger. As is conceded in Briddle, supra, 212 F.Supp. at 589, "Communist imperialism continues to pose a threat to the nation".

On the same day that President Truman issued Proclamation No. 2914 the White House released to the press a list of "Provisions of law which would become operative upon proclamation of a national emergency by the President".[11] Admittedly neither the Trading with the enemy Act nor Title 12 U.S.C. § 95a is mentioned in that list. The significance of this omission is not apparent but it

---

5. This Executive Order appears in full in Campbell v. Chase National Bank of City of New York, 5 F.Supp. 156 (S.D.N.Y. 1933) at 160.

6. Campbell v. Chase National Bank of City of New York, supra, 5 F.Supp. at 161.

7. 77 Cong.Rec. 50-67; 76-81.

8. 48 Stat. 1689.

9. Ibid.

10. 3 C.F.R. (1949-53 Compilation) 99.

11. N.Y. Times, December 17, 1950. An abridgment of the list may be found in 96 Cong.Rec. A7780 as an extension of remarks by Representative John W. McCormack of Massachusetts on December 18, 1950.

may be because of a string of cases up to that time acknowledging the integrity of the criminal sanctions of Title 12 U.S. C. § 95a and Executive Order No. 6260.[12] The omission may also be explained by the fact that, of the more than fifty acts and joint resolutions contained in that list (except for those dealing with consumer credit controls, members of Congress serving in the armed forces, war risk insurance and wages and hours of labor) all deal with matters affecting the army, navy, air force, merchant marine, coast guard and public health service in a variety of subjects all geared to the military needs of the nation. Whatever the reason for the omission may have been it was later supplied in comparable lists.

In March of 1958, the Judiciary Committee of the House of Representatives, evincing a similar interest in "Provisions of Federal Law presently in effect by reason of the national emergency proclaimed by the President December 16, 1950" prepared as a committee print, a report to it dated March 18, 1958 listing (according to the "Explanatory Notes") provisions of law "in effect by reason of this emergency proclaimed by the President". In the "Foreword" Chairman Emanuel Celler explained that

> "the change in the international position of the United States since the end of World War II, the cold war, the Korean episode, have all made it necessary to continue in force many of these temporary statutes. It is largely for that reason that today, almost 5 years after the signing of the Korean armistice, the national emergency proclaimed to meet that situation is still in effect".

The "Explanatory Notes" further indicated that "Group A contains laws which by their terms are clearly national emergency provisions". In Group A under the heading "Committee on Banking and Currency" will be found "[Act of March 9, 1933 (Public, No. 1, 73d Cong. 48 Stat. 1, sec. 2)  *  *  *]" which, as is pointed out above in footnote 4, is the amendment to Section 5(b) of the Trading with the enemy Act permitting control of gold by the President during any period of national emergency declared by him and imposing criminal penalties for violation thereof.

On November 29, 1960 President Dwight D. Eisenhower issued Executive Order No. 10896.[13]

It recited as authority "section 5(b) of the act of October 6, 1917, [the Trading with the enemy Act] as amended, 12 U.S.C. 95a," proclaimed "the continued existence of the national emergency proclaimed by Proclamation No. 2914" [President Truman's December 16, 1950 proclamation of "world conquest by communist imperialism"], "confirm(ed) Executive Order No. 6260 of August 28, 1933 as amended" and made certain further amendments. The amendments in no way affected Section 10 of Executive Order No. 6260 containing the criminal penalties for violation of the order. On the contrary, Executive Order No. 10896 provided that the amendments therein made to Executive Order No. 6260 should "not affect any  *  *  *  criminal cause prior to" its effective date and continued "all  *  *  *  liabilities under Executive Order No. 6260" as if no amendment thereto had been made.

Four months later, on January 14, 1961 President Eisenhower acting again under Proclamation No. 2914 of December 16, 1950 and the Trading with the enemy Act as amended, Title 12 U.S.C. § 95a, further amended Executive Order No. 6260, by Executive Order No. 10905, again in no way affecting the criminal penalties for its violation.[13a]

---

12. Cf. United States v. Chabot, 193 F.2d 287 (2d Cir., 1951) and United States v. Catamore Jewelry Co., 124 F.Supp. 846 (R.I.1954), decided after 1950, each holding that the criminal sanctions in Title 12 U.S.C. § 95a and Executive Order No. 6260 were then in force and had not been repealed by the Gold Reserve Act of 1934, Title 31 U.S.C. §§ 440–443.

13. 3 C.F.R. (1960 Supp.) 89.

13a. 3 C.F.R. (1961 Supp.) 74.

On January 25, 1962 (3½ months before the crimes charged in counts one and two of the indictment herein) the Judiciary Committee of the House of Representatives issued a new committee print of a report to it of "Provisions of Federal Law in effect in time of national emergency". Chairman Celler, in the "Foreword" to the new list, after noting that in 1958, when the prior report was printed, "the emergency proclaimed by the President in 1950 had not yet been terminated and the chronic state of international tensions made it clear that it would not be terminated in the foreseeable future" explained that "heightened international tensions which developed in the latter part of 1961 created a new interest in the legal consequences of the actions which might be taken in the cold war by * * * the President". To meet that interest the list was brought down to date and enlarged to include laws effective upon proclamation of a national emergency not only by the President but also by the Congress.

As in the 1958 print the "Explanatory Notes" put in Group A "laws which by their terms are clearly applicable to a national emergency" and in that grouping under the heading "Committee on Banking and Currency" again listed the Act of March 9, 1933 (cf. note 4 supra) and further cited it as "12 U.S.C. § 95a".

In the light of this history I cannot accept what I understand to be the holding in United States v. Briddle, supra, 212 F.Supp. at 589, that President Truman's Proclamation No. 2914 and President Eisenhower's Executive Orders No. 10896 and No. 10905, merely prolonged "until almost 30 years later 'The Great Depression' of 1933".

I construe the events above recounted to otherwise spell out the following:

Based upon a presidential proclamation on April 5, 1933 of a national emergency in banking, President Roosevelt invoked the control of gold permitted by the Trading with the enemy Act and on August 28, 1933 in Executive Order No. 6260 set forth the method of establishing and maintaining that control.

President Truman proclaimed a new and different national emergency on December 16, 1950 caused by the world conquest of communist imperialism.

President Eisenhower on November 29, 1960 and again on January 14, 1961 because of and to meet the continuing national emergency declared by President Truman continued the control of gold in the manner adopted by President Roosevelt originally on August 28, 1933 with certain amendments thereto, not here pertinent.

■ The criminal sanctions contained in Section 5(b) of the Trading with the enemy Act as amended, Title 12 U.S.C. § 95a were applicable to violations of Executive Orders No. 10896 and No. 10905 and were in full force on May 23, 1962, the date of the crimes charged in counts one and two of the indictment herein.

By the March 9, 1933 amendment to the Trading with the enemy Act the Congress delegated to the President the power, by the proclamation of a national emergency, to make operable in the various ways mentioned in Section 5(b) of that Act, Title 12 U.S.C. § 95a, the control of gold and made the violation of any such presidential orders punishable by fine and imprisonment or both. This, the House Judiciary Committee accepted as a postulate by its committee prints of March 18, 1958 and January 25, 1962, the latter as recently as 3½ months before the crimes charged in the first and second counts of this indictment. I discern no persuasive reason to do otherwise.

Had President Eisenhower simply repeated the appropriate language of Proclamation No. 2914 and that of Executive Order No. 6260 it could not be seriously argued that the effect would have been to prolong the "Great Depression". On the contrary it would have been clearly the proclamation of a distinct national emergency caused by communist imperialism and the activation of the provisions of Section 5(b) of the Trading with the enemy Act as amended, Title 12 U.S.C. § 95a, including the criminal sanctions therein contained. That he chose to in-

corporate them by reference does not, in my view, alter the result. Accordingly, the first two counts of the indictment each state a public offense.

■ As to the third count, charging a conspiracy to violate the Gold Reserve Act of 1934[14] as amended, defendants' sole reliance upon Fuller v. United States, 114 F.2d 698 (9th Cir., 1940) is misplaced. The indictment in that case did "not charge a conspiracy to defraud the United States"[15] as does the instant indictment. It simply charged a conspiracy to acquire and transport gold without the license required by the Gold Reserve Act of 1934. In that form, as the Fuller decision emphasizes, it charged a conspiracy to commit an offense against and not to defraud the United States. Inasmuch as the Act permitted, by certain exceptions therein contained, the acquisition and possession of certain gold without a license, the indictment was held defective for failure to allege that defendant was not within those exceptions, for if he was, his acquisition and possession of gold was not an offense.

The instant indictment charges a conspiracy to violate the Gold Reserve Act of 1934 and the regulations issued thereunder and thereby "to defraud the United States in the exercise of its governmental functions of regulating the value of money, stabilizing the exchange value of the dollar and regulating the acquisition * * * [and] holding * * * of gold" without a license. It states the crime of conspiring to defraud the government under Title 18 U.S.C. § 371 and it is therefore unnecessary to allege that defendants were not within those excepted from the license requirement.[16]

The defendants' motion to dismiss this indictment is in all respects denied.

This case is returned to the Criminal Calendar Part for reassignment for trial.

It is so ordered; no further order is necessary.

14. Title 31 U.S.C. §§ 440–443.

15. Fuller v. United States, 114 F.2d 698, 699.

16. United States v. Barrios, 124 F.Supp. 807 (S.D.N.Y.1952).